EASLY v. DYE AND DYE, BY THEIR NEXT FRIEND.

1. The admission of evidence which, whether relevant or not, cannot by
possibility injure the party against whom it is admitted, furnishes no
ground for the reversal of a judgment.

2. To repel the inference arising from the subsequent possession of a donor
of a slave, it is admissible to prove, that such possession was taken by the
advice of the father of the donees, to show the *quo animo.*

3. When a judgment is offered as proof of indebtedness, to invalidate a gift
made by the defendant in the judgment, the party against whom it is of-
fered, may adduce the entire record, to show to what effect the judgment
and execution are entitled.

4. A donor of property to his children, is a competent witness as between
them and his creditors, on the ground of interest; and is not disqualified
by the act of 1845, the action being detinue by the donees against the
sheriff.

5. The possession of personal property by the deputy of a sheriff, in virtue of
of a levy, is the possession of the sheriff.

6. Detinue may be maintained against the sheriff, by one aggrieved by his
official acts.

7. A delivery of a slave by the donor, to another person, for the benefit of
infants, according to the provisions of a deed, completes the gift, and the
right of the donor to dominion over the slave ceases.  The subsequent
possession by the donor, will not affect the right of the donees, they being
incapable of assenting to it.

8. A trustee cannot, by permitting the property of his *cestui que trusts* to be
hired out by another, divest the title of the donees, or subject the property
to the payment of his own debts, or those of a third person, the donees be-
ing infants.

Error to the Circuit Court of Talladega.

DETINUE, by the defendants in error, for a negro man slave named Turner, before the Hon. G. W. Stone.

The questions presented by the assignments of error, arise out of a bill of exceptions. The defendant, who was sheriff of Talladega, introduced his deputy, Andrew Lawson, by whom it appeared, that as such deputy, he levied an execution, on the 19th September, 1846, in favor of Joel Dodson, against Weldon S. Dye, for $75, besides costs, upon the slave sued for. That a few days after the levy, the sheriff told him, that on the application of James Dye, sen'r, the father of said Weldon, he had agreed that James Dye, and Green Dye, might take the slave and keep him till the 1st of October, the sale day, they agreeing then to produce him. The witness obeyed the directions of the sheriff.

On the day of sale, James Dye offered to deliver the slave to witness, but witness declined to receive him, because the coroner had just informed him, he had taken him under a writ in detinue, sued out in favor of the plaintiff; but afterwards, having conversed with the sheriff, he told said James Dye he might consider the slave as delivered to witness, but he was not otherwise delivered. The sheriff was not present at the levy, and never had the slave actually in his possession.

The plaintiff proved the execution of, and read a deed of gift from Weldon S. Dye, their father. The deed was made on the 21st January, 1841, and recorded in the county court of Talladega. The deed is an absolute conveyance of the slave to the children, in consideration of natural love and affection, and of one dollar. The deed was admitted to probate, on the acknowledgment of the grantor, before the clerk, but was never proved in court. The deed was delivered to James Dye, for the plaintiffs, but in their absence, and in the absence of the slave. The grantor, at the time of its execution, owed debts, some of long standing, amounting to some $300, and had no other property, except two horses, a wagon, and some hogs, worth $300.

It was also proved, that a short time after the deed was made, the children and the slave being present, the grantor handed it to James Dye, his father, and told him, the slave was to work for the support of the children; thereupon the plaintiffs offered to prove, that the grantor being then preparing to leave, declared he was going to Marengo county, to settle permanently; this was objected to by the plaintiffs, but permitted by the court to go to the jury.

Soon after this time, the grantor left his children at his father's house and went to Marengo, but after some time returned sick, and remained at his father's house the remainder of the year. It was proved that in 1842 and 1843, the grantor hired out the slave as his own property. That in 1844, he married, went to housekeeping, and took the slave home with him—that he separated from his wife, and again went to his father's house with the slave, and in 1845 again hired him out, as his own. The plaintiff was permitted to prove, that in 1841, James Dye, the father, advised the grantor to hire out the slave, and pay his debts existing when the deed was made; to this the defendants excepted. The plaintiff was also permitted to prove, that the proceeds of the hire for 1845 were appropriated, part to the support of the children, and a part in payment of debts existing when the deed was made.

The defendant read in evidence a judgment of Joel Dodson, against Weldon S. Dye, for $75 and costs, obtained the 19th September, 1846, it being the same on which the execution was levied, as detailed by the first witness. The plaintiff then produced the original papers in said cause, for the purpose of showing, that Dodson's cause of action, was an assault and battery, committed by said Weldon in 1844. It was also shown, that in the latter part of 1845, the grantor went to live in Wetumpka, that the slave afterwards went to live with him, and remained in his possession until the summer of 1846. The plaintiffs were also permitted to introduce the grantor in the deed, as a witness, though objected to by the defendant, and he excepted.

The court charged the jury, that to maintain the action, the plaintiff must show an actual possession in the defendant, at the time of the action brought. But if he had shown that

Easley v. Dye.

Easly was sheriff, that Lawson was his deputy, and as such seized the slave, his possession was the possession of the principal.

The defendant asked the court to charge, that the action of detinue could not be maintained the sheriff, for property seized in virtue of an execution from this court. That if Weldon S. Dye, delivered the slave and deed to James Dye, sen'r, for the beneficiaries, then this does not amount to a delivery, so as to perfect the gift, notwithstanding the tender years of the plaintiffs, and the presence of the plaintiffs and the slave. That if the delivery were made to James Dye, sen'r, and he lent them to Weldon S., the grantor, and allowed him to remain three years, without demand made, and pursued by due course of law, the slave is subject to his debts. The court refused to give the preceding charges, but gave the last, and at the instance of the plaintiffs, instructed the jury, that if the slave was permitted to go into the possession of the grantor, to hire him out for the purpose of paying debts due at the execution of the deed, it was not a loan within the meaning of the statute.

The court also charged, that if the grantor, the plaintiffs, and James Dye, were all present, the plaintiffs being from one to three years old, and the grantor in good faith delivered, and actually parted with the dominion over the slave, to James Dye for the use of the plaintiffs, and the deed was then delived to James Dye, it was a valid, and executed gift, as against subsequent creditors.

To the charges given, as well as to those refused, the defendant excepted, and now assigns for error.

S. F. RICE, for the plaintiff in error.
L. E. PARSONS, for the defendant in error.

COLLIER, C. J.—1. The declarations of the donor, at the time he delivered the deed to his father, that he desired the latter to keep his children and the slave in question, and permit the slave and his labor to go towards the support of the donees, was admitted without objection. But it was objected, that the declaration simultaneously made by the do-

21

nor, that he intended to go to Marengo and settle there permanently, was inadmissible. It is difficult to perceive what influence this latter fact could have upon the verdict of the jury, even when taken alone, or in connection with the evidence that the donor was then preparing to leave his home, and did leave his children and slave in his father's custody, go to Marengo, remain there several months, and until he was induced by sickness to return. It was perhaps intended to show an additional inducement to give the slaves, or perhaps to strengthen the proof of delivery, or repel the supposition that the donor contemplated a resumption of the possession. In Seawall v. Glidden, 1 Ala. Rep. 52, we said, "that a gift once perfected by delivery and acceptance, is irrevocable, unless it be prejudicial to creditors, or the donor was under a legal incapacity, or was circumvented by fraud." The declaration would be entitled to no consideration in determining the fact of delivery, nor would it lend any aid in showing that creditors were prejudiced, or the donor overreached in making the gift. In admitting the evidence, then, the defendant could not have been injured, nor does it appear that any weight was accorded to it in the charges to the jury ; and whether relevant or not, its admission furnishes no ground for the reversal of the judgment. But if the fact was material, did the circuit court err in admitting the declaration? It does not appear that it was not made when the donor was in the act of leaving his previous home ; and upon the rule which makes all reasonable intendments in favor of the decision of the primary court, and construes a bill of exceptions most strongly against the party excepting, may it not be inferred that the declaration was made under the circumstances supposed? If this hypothesis may be indulged, was not the evidence properly received? Pitts v. Burroughs, 6 Ala. Rep. 733.

2. Whether the permission of the donor to take possession of the slave and hire him out, could affect the right of the donees, if there had ever been a *bona fide* and effectual delivery to perfect the gift, is a question which may be considered in the further examination of the cause. However the law may be upon this point, the defendant did rely upon the subsequent possession of the donor, and acts of ownership,

by him, as destructive of the donees' title.   For the purpose
of repelling such an inference, we think it was clearly com-
petent for the plaintiffs to show, that the donor took posses-
sion of the slave by the advice of his father, that a fund might
be raised by his hire to extinguish the claims of the donor's
creditors, which might otherwise have rendered the gift in-
operative.    The fact that the possession was not taken si-
multaneously with the advice given, does not furnish a test
of its admissibility ; for it would, notwithstanding, serve to
show *quo animo*, the one party parted with, and the other
received the possession.    True, it might not be conclusive,
yet it was proper for the consideration of a jury, if material.
The competency of such evidence does not depend upon the
principle upon which a declaration is admitted as part of the
*res gestae;* but it is enough if the act follow in some rea-
sonable time.    It is still more clear, that if the evidence be
important, the donees might show that the money received
for the hire was appropriated for their benefit.    Powell v.
Olds, 9 Ala. 861.

3. In Cato v. Easley, 2 Stewart's Rep. 214, it was decided
that a voluntary conveyance of property by one indebted at
the time, was fraudulent in law against existing creditors,
and that the intention of the donor determines the validity of
such a conveyance as against subsequent creditors, which in-
tention was to be ascertained from the accompanying and fol-
lowing circumstances.    To the same effect is Miller v.
Thompson, 3 Porter's Rep. 196, and many subsequent cases;
and such may be regarded the settled law of this court.
This being the established rule, was it not incumbent upon
the defendant, if he would show the gift to be invalid, be-
cause the donor was indebted when it was made, to prove
that he was a creditor at that time ?   However this may be,
it was certainly allowable for the plaintiff to show, not only
that there was a formal gift, but that it was good against the
execution creditor under whom the defendant justified the
seizure of the slave.    Although it is a general rule, that the
record of a judgment is not evidence against a stranger as to
the matters adjudicated, yet it is admissible to show that
such a suit as it describes was pending, and when and how
it was determined.    In the present case, the defendant in-

troduced the judgment and execution for his own justifica-
tion, and although they did not show that the party in whose
favor they were, was a creditor of the drawer at the time of
the gift, we think it was competent for the plaintiffs to ad-
duce the entire record of the suit for the purpose of showing
to what effect the judgment and execution were entitled.
This was the only object proposed by the plaintiffs. The
record indicated the character of the action, and *prima facie*
within what period it occurred ; and the latter was a materi-
al inquiry.

4. The objection to the competency of the donor as a
witness for the plaintiffs, was made in general terms, upon
the ground that he was interested in the result of the suit,
and if not interested, his examination was inhibited by pub-
lic policy. Neither of these grounds, in our judgment, would
warrant the exclusion of the witness. True, as a matter of
feeling, he might desire the plaintiffs to recover, yet their
success could not give him any interest in the slave, or the
profits of his labor, nor relieve him from the legal and moral
duty of maintaining them, if able to do so. The gift was
absolute, without the reservation of any interest to himself,
and the remark which he made to his father, when the slave
was delivered, could not have the effect to create a trust for
his benefit, or impair the rights of the donees. If the plaintiff
recovered, the slave might furnish ampler means for the sup-
port of the donees, yet this does not show that the donor had
a direct interest in the event of the suit. Besides, it may be
asked, if he had not a direct and greater interest in favor of
the defendant, as the failure of the plaintiffs would leave the
slave liable to satisfy the judgment? The mere statement
of this question suggests its own solution, and shows that
the witness, so far as interest is concerned was competent
for the party calling him. We are not aware of any consid-
eration of policy, which should have induced his rejection.
The act of 1845, declares that a mortgagor, or defendant in
execution, in all cases of the trial of the right of property,
shall be incompetent to give testimony between the parties.
This enactment introduces an arbitary rule, irrespective of
the interest of the witness, but is applicable to a specific case,
and cannot be extended by construction to an ordinary ac-

Easley v. Dye.

tion, in which the title to personal property is litigated. The policy of the law is to restrict the disqualification of witnesses, as indicated by the decisions of all courts at the present day; and our own adjudications show, that the act referred to lends no aid to the objection we are considering. Yarborough v. Moss, 9 Ala. Rep. 382; Webster v. Smith, 10 Id. 429; Brumby v. Langdon & Co. Id. 747.

5. A sheriff is liable *civiliter* for the acts of his deputy, and in the performance of official acts, the deputy is regarded as his representative; if therefore, the deputy levies on personal property, the possession which he thus acquires is not only his own, but in legal contemplation, is that of his principal also, although the latter may not take it under his actual control, or may not in fact have seen it. The principle here stated, is so firmly established, that it need not be supported by the citation of authorities. See however, 2 Greenl. Rep. 270; 4 Mass. Rep. 60; 5 Id, 271; 7 Id. 464; 13 Id. 114; 17 Id. 244; 15 Id. 200; 1 Pick. Rep. 271; 2 McC. Rep. 410; 3 Hen. & Munf. Rep. 127; Cooke's Rep. 413; 1 Rawle's Rep. 468; Minor's Rep. 386; 2 Call's Rep. 273; 2 N. Hamp. Rep. 184; 3 Porter's Rep. 193. The sheriff and his deputy in respect to each other, stand in the relation of master and servant, or principal and agent; and for injuries to third persons from the acts of the deputy, the law applicable to master and servant, and principal and agent furnish analogies by which to determine the liability of himself and the sheriff. Now although it may be necessary to entitle the plaintiff to recover in *detinue*, that he should show the defendant was in possession of the chattel, yet if another person took and retained the possession by his order and direction, and under his control, this is quite sufficient, and satisfies the requisition of the law. This is the precise predicament in which the facts place the defendant in the present case. No question is raised as to the effect of the permissive possession of James Dye, sen'r, under the direction of the defendant himself. We would however remark, that we should be inclined to treat it as a mere continuation of the defendant's possession—indicating the exercise of his control of the slave under the levy, and substituting by his

own act the bailee as his custodian, instead of the deputy who levied the execution. See 8 Ala. 466.

6. In Bissell & Carville v. Lindsay et al. 9 Ala. R. 162, it was held, that a party whose property had been improperly levied on under a *fi. fa.* against another person, might maintain an action of detinue at common law, or under the statute against the officer taking possession of the chattel. This citation is conclusive to show, that there is nothing in the official character of the sheriff, or in the manner in which his possession was acquired, that can exempt him from liability in detinue at the suit of the true owner of the slave. Burgin v. Burgin, 1 Ired. R. 453.

7. It is essential to a *parol* gift of a chattel, that there should be an *actual delivery* of the thing. Sims v. Sims's adm'r, 2 Ala. 117, and cases there cited. An effectual delivery is one by which the donor parts with the dominion of the thing in favor of the donee. Id. In Seawell, by his next friend v. Glidden, 1 Ala. 52, the donee was a son of the donor, under twenty-one years of age, and the jury, by a special verdict found that there had been a formal delivery of the slave, the subject of the gift, without stating to whom it was made.

Upon this branch of the case we said, "Assuming the delivery to have been made to the plaintiff, or some one else for him, with the design of carrying out the purpose expressed in the deed, we are of opinion that the possession of the donor under the circumstances could not ivalidate the gift. It must be remembered that the donee was of very tender years when the gift was made, continued to reside with his father up to the period of the death of the latter, and had not in fact attained his majority when the present suit was commenced. The plaintiff had no guardian in respect to this or any other property, appointed by law. He lived under the paternal roof, and was controlled both himself and the slaves by the donor; the possession of the father must be regarded as his possession. Any other conclusion would tend to injustice. The gift, if perfected by a delivery and acceptance, we have seen, was irrevocable by the donor. The donee, on account of his infancy, was not entitled to the *actual* possession of the slaves, and could do no act to prejudice his

rights; and inasmuch as he could not act in respect to the property, it seems necessarily to follow that he cannot be injured by an omission to act. This course of reasoning brings us to the conclusion, that the failure of the plaintiff to retain the possession of the slaves, separate and apart from the control of the donor, does not bring his case within the influence of the statute of frauds, and thus avoid the gift." In that case, as in this, a deed of gift was executed, which was in like manner inoperative against creditors and purchasers, because it had not been duly registered; and the delivery in both cases was subsequent to the execution. We then said, that though such a deed was not regularly proved and recorded, it may be regarded as equivalent to a parol declaration of the donor's wishes, and if the constituents of a gift *inter vivos* are shown, the donee's right becomes complete. The case cited is strikingly analogous to the present in respect to the point we are examining, and shows that if the donor delivered the slave in question to James Dye, sen'r, to be held for the benefit of the donees according to the provisions of the deed, and that the possession was taken and retained by James Dye, then the donor parted with the dominion and control of the slave, and the gift was complete. This being the case, we have seen that the possession subsequently taken by the donor, could not affect the rights of the donees, who, in consequence of their tender years, were incapable of authorizing, or assenting to it. The ruling of the circuit court was in conformity to these views, and the fact of an effectual delivery was properly referred to the jury. Durett v. Sewall, 2 Ala. Rep. 669, is unlike the present case. This court there use the following language: "We will not say that a deposit of property in the hands of a third person, if allowed to remain there, would not authorize the donee to recover it upon the ground that the donor had relinquished all claim to it in his favor. But such is not the present case. The father *pro forma* delivers the possession of a slave to a friend, for the purpose of perfecting a gift to an absent infant son, but all this was done without relinquishing for an instant the dominion or property; for it is shown by the record that the possession of the donor continued uninterruptedly for five or six years, and until he sold the slave." What was said

by the court *arguendo* was intended to establish this conclusion, and to show that the case was not analogous to Sewall v. Glidden, *ut supra*.

8. The facts do not show that the donor had possession of the slave subsequent to the gift for three continuous years; and if they did, the effect would not be to annul the gift and re-invest the donor with the title in favor of subsequent creditors and purchasers. James Dye, it seems, had no interest in the slave, but held him merely for the purpose of protecting the right of the donees, and could do no act destructive of it. He could not make a loan to continue for three years, so as to subject the slave to the payment of the debts of the person to whom he was lent, under the provisions of the statute of frauds. True, the possession of the donor may have given to him a delusive credit, yet the donees had no agency in producing this state of things, and were incapable in consequence of their minority, of acquiescing in or preventing it. If the donor took possession as the agent of James Dye, for the purpose of hiring the slave to some other person, with the view of raising a fund to free him from the claims of creditors, and did actually hire him under such agency, the transaction is not a loan, within the second section of the statute of frauds. Bank of Alabama v. Craft, 6 Ala. R. 622.

Even conceding that the donee's grandfather was a trustee for them under a formal appointment, and could divest their title by a *bona fide* sale of the slave to one ignorant of the trust, yet there is no ground upon which the trust property can be subjected to his debts, or to the debts of a third person to whose hands he may commit it, either to be kept or hired out. This conclusion is a necessary sequence from what has been said upon this and the preceding point. It results from this view, that the judgment of the circuit court must be affirmed.