Matthews v. Hoagland.

---

## ALMIRA S. MATTHEWS

*v.*

## MARY E. HOAGLAND et al.

1. Where a bill, in its averments, sets forth facts sufficient to show that the complainant is entitled to relief as an administrator, or that the defendant is liable as such, it is not necessary that either should be so styled in the process, or in the commencement of the bill, or in the prayer for process.

Matthews *v.* Hoagland.

2. The privilege of professional secrecy is not confined to the knowledge derived by counsel from communications made to him by, or in conference with, the client, but extends to information obtained from documents submitted for his inspection or custody.

3. If the communication, or conference, between client and counsel is to devise means by which a crime is to be committed, in which the attorney takes an active part, there is no privilege—he ceases to be counsel and becomes *par. ticeps criminis;* if he takes no part, there is no professional privilege, because it cannot be a solicitor's business to advise in furtherance of a criminal object.

4. The contriving of a crime or a fraud is no part of the professional occupation of an attorney or solicitor. In order that the rule of professional privilege may apply, there must be both professional employment and professional confidence. If the client has a criminal or fraudulent object in view in his communication with his counsel, one of those elements must necessarily be absent. If the object is avowed, the client does not consult his adviser professionally; if it is not disclosed, he reposes no confidence.

5. In a civil suit the first test as to whether the communication involved a purpose which was or was not tainted with fraud, is the issue as made by the pleadings in the cause.

6. A party to a suit is not a competent witness, under the act of 1880, to testify adversely to another party suing in a representative capacity, as to a transaction of the deceased with a person other than the witness, in which the witness and such person are interested, although such interests are divisible.

7. If the representative in such action testifies, in his own behalf, to any transactions of the deceased with the witness or another, which are relevant to the relief in the action, the other party may be a witness, in his own behalf, to all transactions or statements of the deceased which are pertinent to his case.

8. To constitute a valid gift *inter vivos,* there must be such a transfer of the subject-matter as will pass the donor's title at once to the donee, absolutely and irrevocably divesting the former of, and investing the latter with, all of the donor's right or title therein, and control and dominion thereof.

9. The actual delivery of negotiable bonds, with words or acts indicating a present absolute gift, constitutes a valid gift *inter vivos.*

10. In this state the delivery of a certificate of stock without actual transfer or a written assignment or power to transfer, although accompanied with words of gift, does not constitute a valid gift *inter vivos.*

11. This court has jurisdiction to entertain a suit by an administrator against a co-administrator, when the defendant is charged with misconduct as to the assets of the estate, which jeopardizes the rights of those interested therein.

On bill, answer and proofs in open court.

*Mr. Martin L. Trimmer* and *Mr. Charles A. Skillman,* for the complainant.

*Mr. J. Newton Voorhees,* for the defendants Mary E. Hoagland and Asa P. Hoagland.

*Mr. Albert D. Anderson,* for the defendants Helen C. Matthews and George H. Matthews.

GREEN, V. C.

Henry Matthews died January 22d, 1886, at Lambertville, in this state, leaving Almira S. Matthews, his widow, and Mary E. Hoagland and John H. Matthews, children by a former wife, his only heirs at law.

He was possessed of considerable personal property, and, after a protracted contest in the orphans court of the county of Hunterdon, administration of his estate was granted March 24th, 1886, to his widow Almira S., his son John H. and his brother George H. Matthews, who took upon themselves the administration of the said estate, filed an inventory of such property as they admitted came into their hands, and in time settled up all claims against the estate, and filed their final account in the orphans court of said county, fully accounting for all the personal estate they reported as received by them.

All the debts of the decedent were paid, and the persons entitled, by the statute of distribution, to any estate, remaining in the hands of the administrators and unadministered, being the widow and the two children, the balance was, by the decree of the said court, distributed to the complainant, to John H. Matthews and Mary E. Hoagland in equal parts.

John H. Matthews, since the settlement of the estate, has died, leaving Helen C. Matthews his widow, who by his will was made sole legatee and devisee of his estate and sole executrix of his will.

The complainant claiming to have discovered that her co-administrator John H. Matthews, with his sister Mrs. Hoagland, had taken possession of certain personal property belonging to

the intestate, which was not included in the inventory or admin-
istered upon, commenced this action on the theory that she, as
widow, being entitled to one-third of the balance of the personal
estate after the payments of debts, could, under the circumstances
stated, proceed directly in a suit in her own behalf in this court
to recover such portion.   On the first day of the trial, however,
it was determined by her counsel to prosecute the suit by her, as
administratrix of her husband's estate, to subject personal prop-
erty, charged to have been improperly diverted or retained, to
administration as assets of said estate.   Strictly speaking, the
suit was not brought by complainant as administratrix, nor
against the representative of John H. Matthews as administrator,
neither he nor she being styled as such in the process or in the
commencement of the bill, or in the prayer for process, yet the
bill correctly described the character and station of the parties,
sets forth fully facts which would give complainant a right as ad-
ministratrix, and make defendants personally, or as executrix or
administrator, liable as such, so that the court, upon the allega-
tions of the bill, could give the proper relief.   Under these
conditions the course determined upon was one recognized as
allowable in this court.   *Evans* v. *Evans, 8 C. E. Gr. 71; Ran-
son* v. *Geer, 3 Stew. Eq. 249; Plaut* v. *Plaut, 17 Stew. Eq. 18;
White* v. *Davis, 3 Dick. Ch. Rep. 22.*   George H. Matthews,
who was also an administrator of the estate of Henry Matthews,
was not a party to the suit originally, and as he was a necessary
party to a suit to be prosecuted on the theory adopted, the case
was ordered to stand over to make him a party defendant in case
he declined to act with her as a party complainant.   The bill was
amended, bringing in George H. Matthews, as administrator of
Henry Matthews, deceased, as a party defendant, and he appeared
and answered as such, and the cause proceeded.

Henry Matthews, the intestate, at the time of his death, and for
many years prior thereto, had resided in Lambertville.   Previous
to his marriage with the complainant he had occupied one part of
a double house, his son John and family living in the other.   It
was one house, but they lived as two families; Henry Matthews,
after the death of his first wife, having a housekeeper and an

unmarried daughter as members of his immediate household. He was the owner of considerable real and personal estate; so much of his personal property as consisted of bonds, mortgages, promissory notes, certificates of stock and such securities he kept in a tin box, usually placed in a secretary in a room on the second floor of the part of the house in which he lived. The box appears to have been locked most of the time and the key in his possession.

He was married to the complainant on the 10th day of November A. D. 1883, and then went to live with his wife at her residence in a different part of the town of Lambertville, and continued to reside there until he died. He did not, however, take his tin box containing his securities with him, but left that in the secretary in the second-story room of his former home, where it remained until after his death, the key being, however, in his personal possession. The whole house after the old gentleman's marriage was taken possession of by his son John H. Matthews and family.

The complainant alleges that after the death of Henry Matthews the box was opened by some one of the parties and certain securities taken from it. There is no denial in the answer or evidence that this is substantially true; it is admitted, or proved, the box was opened by George W. Dunham with a key of his own procuring, in the presence of John H. Matthews and Mrs. Hoagland, and that certain securities, viz., two bonds of the Burlington and Cedar Rapids railroad, one for $500 and one for $300, a bond of the Lehigh Coal and Navigation Company of $1,000, a certificate for ten shares of the stock of the Camden and Amboy Railroad and Transportation Company of the alleged value of $2,200, and a certain sum of money in United States currency, together with a promissory note made by one Vincent R. Matthews to the order of Henry Matthews for the sum of $175, were taken from the box by George W. Dunham and by him given to and retained by John H. Matthews, except the two bonds of the Burlington and Cedar Rapids Railroad Company, which were taken to Newark by Dunham, sold, and $800 of the proceeds given by him to John H. Matthews. It is not pretended that

:any of these securities were included in the inventory by John
H. Matthews, one of the administrators.   Besides bonds, mort-
gages and notes the inventory filed includes only the following
securities :

| | |
|---|---|
| 49 shares Lehigh Valley railroad stock.................................... | $2,842 00 |
| 20 shares Lambertville water power stock, at $30........................ | 600 00 |
| 100 shares Lambertville National Bank stock, at $33.................... | 3,300 00 |

which were also in the box at the time those in question were
taken therefrom.

The defendants Mary E. Hoagland and Helen C. Matthews,
by their answers, claim that these securities, other than the note
of Vincent R. Matthews, did not belong to the estate of the in-
testate, but were the property of Mrs. Hoagland and John H.
Matthews ; that these securities represented a portion of the estate
of the deceased mother of these parties, and that the ownership
of the same had been vested in them by their father during his
lifetime, in order that they should have the property which had
come to him through their mother.

If it had not been stated with seeming sincerity that the de-
fendants based their right to these securities on the ground that
they were the property of the mother of John H. Matthews and
Mrs. Hoagland, it would seem unnecessary to consider such a
suggestion.   The only evidence bearing on this point is that the
first Mrs. Matthews brought her husband a considerable estate—
stated by one witness as $12,000—but this is not inconsistent
with the fact that he had become legally entitled to it, and that
he had actually done so is only made the more certain from the
promise Mrs. Hart says he made his first wife on her death-bed,
that he would give her children the property she brought him.
As to these identical securities ever having belonged to the first
wife the evidence and presumptions are all the other way ; the
certificate of stock of the joint companies was in the name of
Henry Matthews, and the Burlington and Cedar Rapids railroad
bonds were in a large envelope, evidently the one used originally
when the bonds were issued, and on which the name of Henry
Matthews was written as the owner.   As to the Lehigh Coal and

Navigation Company bond, it is in the possession of one of the defendants and is not produced, as it is fair to assume it would have been if it had borne any evidence of ownership by the mother. If it is true that the securities in question represented the estate which he had received by his first wife, there is no evidence that it came to him charged with any trust which can be recognized in a court of law or equity, or that it was not as absolutely his own, subject to his disposal and control, as any property which he might have individually acquired.

This being the case, the contention of the defendants that these securities did not belong to Henry Matthews at the time of his death can only be maintained on the ground that he had, during his lifetime, parted with the ownership of them.

By allowing his tin box to remain in the secretary in the house where he formerly resided he did not abandon the possession of its contents. The house was in the occupation of his son and family and he was a frequent visitor there. The box was locked and the key in his own possession. When occasion required he went himself for anything in the box which he wished, or sent some trusted agent. The securities being in the box, in his possession constructively at the time of his death, are presumed to have been his property unless they themselves bore evidence of ownership in some other person. The bonds were such as are known as negotiable securities, payable probably to bearer—those of the Burlington and Cedar Rapids railroad were sold in Newark to the North Ward National Bank as in the market; the Lehigh Coal and Navigation bond is in the possession of Mrs. Helen C. Matthews, and it is not even suggested that it appears on its face to have belonged to any person other than the deceased. The currency, of course, bore no ear-marks of ownership. The note of Vincent R. Matthews has been destroyed, and it is disputed whether or not it was ever endorsed by Henry Matthews, to whose order it was payable. The certificate of the shares of the joint stock of the Delaware and Raritan Canal and the Camden and Amboy Railroad and the New Jersey Railroad and Transportation Companies was produced on the trial by the transfer officers of the companies. It is dated October 31st, 1870,

and certifies that Henry Matthews is the proprietor of ten shares of the Camden and Amboy Railroad and Transportation Company, subject to the agreements between the companies. It now has endorsed upon it an assignment to John H. Matthews, dated May 19th, 1884, purporting to be signed by Henry Matthews, whose signature appears to have been witnessed by William H. Hart. Mr. Leroy H. Anderson, the officer of the companies, testifies that the paper in its present condition was presented to him April 1st, 1886, by John H. Matthews, who was accompanied by George W. Dunham, and surrendered, and a new certificate for ten shares was issued to John H. Matthews. It is insisted by the complainant that the name Henry Matthews, signed to the transfer, is not the handwriting of the intestate, and that the same was written thereon after his death. William H. Hart, the subscribing witness, was sworn and testified that he was a brother-in-law of John H. Matthews; that the signature as subscribing witness is his, but he could not say when it was written— that he put his name there at the request of John H. Matthews; that he did not look at the paper, and can't remember if Henry Matthews signed it at the same time or not; he don't know if there was any one else there, or if he signed it before or after Henry Matthews's death. He says he made an affidavit in this case, but did not read it, relying on the statement of complainant's counsel as to its contents. On his cross-examination he said he had witnessed Henry Matthews's signature a number of times and would suppose that he would remember if he had witnessed a signature purporting to be his, after his death. This is the subscribing witness, and there is an entire failure on his part to prove that the transfer was signed by Henry Matthews in his presence; all that he does say positively is to identify his own signature, and that he signed it at John H. Matthews's request. Defendant called no witnesses to establish the genuineness of the signature of Henry Matthews to the transfer of the stock. George W. Dunham was called as a witness by the complainant. His testimony, if competent and reliable, would remove any doubt on this and other points. It was, however, objected by defendants' counsel that any knowledge Dunham pos-

Matthews v. Hoagland.

sessed had been acquired by him in his professional capacity as
counsel for Mrs. Hoagland and John H. Matthews, and was in-
competent. It appeared in evidence that Dunham was a prac-
ticing attorney, and had acted professionally both for Mrs. Hoag-
land and John H. Matthews. On January 11th, 1884, shortly
after Henry Matthews's marriage to complainant, Mrs. Hoagland
gave him $100, to be used by him for expenses necessary in the
settlement and arrangement of the affairs of Henry Matthews *and*
in the interest of herself and her brother John H. Matthews, as
expressed in his receipt therefor. He says himself that when he
was first called upon with reference to this matter it was by Mrs.
Hoagland, who came for him from Lambertville to Flemington,
and took him to John H. Matthews's house in the former place.
He fixes the first time of his going there on this business as
January 1st, 1886—prior to Henry Matthews's death. This
date is important for several reasons, as will afterwards appear.
He fixed this and other dates by reference to entries which were
made in a diary, as he says, at the time. He leaves no loop-hole
for mistake. If he did not go with Mrs. Hoagland to John H.
Matthews's house in Flemington and there open the tin box on
New Year's day, 1886, he has not told the truth upon the witness-
stand. He says John H. Matthews, Helen C. Matthews and
Mrs. Hoagland were all present on the occasion. He is contra-
dicted by Mrs. Helen C. Matthews and her mother, Mrs. Hart,
who both swear that on that New Year's day both Mr. and Mrs.
Matthews were, as they always were on New Year's day, at Mrs.
Hart's house in Phillipsburg, and positively by Mrs. Hoagland,
who swears that she did not go for him until after her father's
death, which was January 22d. Mrs. Hoagland went but once
for him, and Mrs. Hart testifies she was at John H. Matthews's
house on that occasion; that it was after Henry Matthews's
death, and that she (Mrs. Hart) was at home in Phillipsburg on
the 1st of January. I regret to say that the weight of evidence
is so strongly against the date given by Dunham that it must be
taken as not true. He says while he did not consider himself
as counsel for John H. Matthews, he recognized the fact that
he was Mrs. Hoagland's counsel at the time he went with her,

and presumes he went as a lawyer. The very character of the business, as it appears from the evidence, leaves no doubt that he was brought there in such a capacity. Mrs. Hoagland, when she came to testify, said she went for Dunham to take his advice what to do; that he had been acting as her counsel, doing business for her for some years; that she was unwilling to do anything with reference to the securities she claimed without advice of counsel and having him present; and Dunham and she both say that whatever was done was done in pursuance of his advice. Mrs. Hart also says that Mrs. Hoagland, prior to going for Dunham, said she would have nothing done until she had consulted counsel, and proposed George Dunham.

We have the case of a practicing attorney, who had acted as such for these two parties, called on by them to consult with and advise with reference to their rights in certain property, and what course they should pursue in enforcing the same, asked as a witness to testify as to what took place and the facts which came to his knowledge while in consultation and acting in such capacity.

The mere statement of such a case to a lawyer is to invoke the application of the rule which places the seal of secrecy on the lips of counsel.

It is claimed, however, that the rule of privileged communication does not apply in this case. First to Dunham's testifying whether the certificate of railroad stock was endorsed or not at the time he first saw it—that his knowledge of it was not derived from any communication made to him by the clients, but came to him from the simple operation of his eye-sight. He was, however, only enabled to see it on this first occasion in consequence of his employment as counsel, and when engaged as such. The certificate was taken from the box by himself, he being there as the professional adviser of these parties. The privilege of professional secrecy is not confined to the knowledge derived by counsel from communications made to him by, or in conference with, the client, but extends to information obtained from documents submitted for his inspection or custody. *Wheatley* v. *Williams, 1 Mees. & W. 533; Robson* v. *Kemp, 5 Esp. 53; Brard*

Matthews v. Hoagland.

v. *Ackerman, 5 Esp. 111; Coveney* v. *Tannahill, 1 Hill 33; Brandt* v. *Klien, 17 Johns. 338; Brown* v. *Payson, 6 N. H. 443; Gray* v. *Fox, 43 Mo. 570; Crawford* v. *McKissack, 1 Port. (Ala.) 427; Dietrich* v. *Mitchell, 43 Ind. 40.* It was next insisted that the rule did not apply in this case because the consultation between the parties was in furtherance of the commission of a crime or the perpetration of a fraud. I held on the trial that the privilege did extend to communications from the client to counsel of what the client had already done with reference to the subject-matter of the consultation, but that if the communication or conference was to devise means by which a crime was to be committed in which the attorney took an active part either by advice or co-operation, his position as counsel ceased, and he became *particeps criminis,* and that no privilege extended to what transpired between them at the concoction of such conspiracy. The witness manifested no disposition to testify on this basis, and he was not pressed to do so under the ruling.

Serious uncertainty has undoubtedly existed as to whether a fraudulent purpose in the subject-matter of the employment deprives the client of the right to close the lips of counsel, or whether the rule of privilege extends to communications, the object of which may have been the furtherance of fraud. It has arisen from a conflict of decisions in England and in this country, even between courts in the same state. On the trial I followed the decision of Chancellor Walworth in *The Bank of Utica* v. *Mersereau, 3 Barb. Ch. 528,* as later than that in *Coveney* v. *Tannahill, 1 Hill 33.*

Mr. Justice Bronson, in the latter case, had said (at *p. 41*): "Now, if the plaintiff consulted counsel beforehand as to the means, the expediency, or consequences of committing such a fraud, his communications may, perhaps, be privileged; and they are clearly so, as to what he may have said to counsel since the wrong was done. But the attorney may, I think, be required to disclose, whatever act was done in his presence towards the perpetration of the fraud. One who is charged with having done an injury to another, either in his person, his fame, or his property, may freely communicate with his counsel, without danger of having

30

his confidence betrayed through any legal agency. But when he is not disclosing what has already happened, but is actually engaged in committing the wrong, he can have no privileged witness." Chancellor Walworth, in *The Bank of Utica* v. *Mersereau, 3 Barb. Ch. 528* (at *p. 598*), says: "The seal of professional confidence, I believe, has never been held to cover a communication made to an attorney to obtain professional advice or assistance as to the commission of a felony or other crime which was *malum in se*. The opinion of Chief-Baron Gilbert certainly was that the privilege of attorney and counsel did not extend to such cases (*1 Gilb. Ev. 277*), and as no one is entitled to the advice or assistance of counsel, or of an attorney, to enable him to do an illegal act, if the question had arisen for the first time in this case, I should have no hesitation in deciding that the communications made by Hoffman and Mersereau to their attorney were not privileged; because they were made for the purpose of getting his professional assistance in the perpetration of a fraud upon their creditors. It is as contrary to the duty of an attorney, or a counselor, to aid his client, by professional services, in the perpetration of a fraud, or in the violation of any law of the state, as it is to aid him in the commission of a felony; although the moral turpitude of the act may be much greater in the one case than in the other. I can, therefore, see no good reason for extending the principle of privileged communications to the first class of cases, and not to the last. The practice, however, appears to have been otherwise for more than a century and a half; and I do not now feel authorized to adopt a new rule on the subject." After citing various authorities that the existence or disclosure of a fraudulent purpose did not remove the obligation to treat the communication as privileged, he continues (at *p. 600*) : "With the exception of what was said by Mr. Justice Bronson in *Coveney* v. *Tannahill, 1 Hill 36*, my researches have not enabled me to find anything in conflict with the decisions to which I have referred. I, therefore, do not feel authorized to say that the fact that Cotton was employed by Hoffman and Mersereau to assist them in a transaction which, from what was said in his presence, he must have known to be a fraud upon their creditors, deprived

their communication of the seal of professional confidence. I admit, however, that I should have been much better satisfied if I had found this question an open one; or rather if I had found the decisions of the courts the other way. For I think with the late chief-justice of our supreme court, that the privileged relations of attorney and client ought to be permitted to exist only for honest purposes; but not to enable the client to perpetrate a fraud, or to violate the laws, under the advice of counsel, or through any other professional aid." The learned chancellor, therefore, felt compelled by the weight of the authorities which he cited to hold as he did, although he thought principle and morals could have been better sustained had the court laid down the rule differently.

Of the cases cited by the chancellor as controlling his action, *Foster* v. *Hall, 12 Pick. 89*, was the most recent. It is a decision by Chief-Justice Shaw. So much of the opinion, as bears upon the point in question, is based on an extract from *Phil. Ev.*, referring to the case of *Cromack* v. *Heathcote, 2 Brod. & B. 4.* Chancellor Walworth (at *p. 599*) also refers to this case, and to that of *Doe* v. *Harris, 5 Car. & P. 592*, stating the point dedecided in each. So far as they hold that professional privilege extends to a transaction for an illegal or fraudulent purpose, *Cromack* v. *Heathcote* and *Doe* v. *Harris* are expressly overruled in *Queen* v. *Cox & Railton, 14 Q. B. Div. 153*, while the other two cases cited by him, *Holt* v. *Tyrrel, Skin. 404, Holt 76, 1 Ld. Raym. 733, Bull. N. P. 284*, and *Hyde* v. *McCartney, 2 Moll. 544*, must be regarded as disapproved. This recent case has thus so undermined the authorities which Chancellor Walworth felt constrained to follow, we are forced to the conclusion that had the decisions stood at that time as they do now, he would have held as he thought principle and the character of the profession demanded.

The case of *Queen* v. *Cox & Railton* was this: In February, 1882, one Munster brought an action against Railton & Co., publishers of the *Brightonian*, for libel; Railton alone entered an appearance. Judgment was rendered for the plaintiff and execution issued. The sheriff was met by a bill of sale, dated and

registered prior to the execution, from Railton to Cox. An interpleader issue was directed to be tried with reference to the bill of sale, and on the trial a deed between Railton and Cox, dated April 9th, 1881, was produced, by which they agreed to become partners; it had endorsed on it a memorandum of dissolution purporting to have been signed January 3d, 1882. Subsequently, Cox and Railton were indicted upon a charge of conspiring to defraud Munster, and upon that trial the case for the prosecution was that the bill of sale was fraudulent and made for the purpose of depriving Munster of the fruits of his judgment, and, as evidence thereof, that the memorandum dated January 3d, 1882, was, in fact, not endorsed until after the judgment, and to establish this they called Mr. Goodman, a solicitor. His testimony was objected to, but the objection was overruled. He testified substantially that both defendants called on him after the judgment and consulted him with reference to a transfer of property, he advised them none was good except one to a *bona fide* purchaser, that there must be a change of possession and that Railton could not convey to Cox on account of the partnership; they asked the amount and paid him his fee, and left. The defendants being found guilty, the recorder of London, before whom the case was tried, considering that the evidence of Mr. Goodman had a marked effect in inducing the jury to arrive at that verdict, reserved judgment and presented the question, whether the evidence was properly received, to the court of queen's bench. The argument was commenced before five judges, when, as stated by Chief-Justice Coleridge, recognizing the importance of the case, and feeling the necessity of protecting all legitimate communications between clients and their legal advisers, and as the cases were not altogether consistent, the argument was directed to be had before a full court, so that an authoritative rule might be laid down. Subsequently it was argued before ten judges. The conviction was unanimously confirmed, Mr. Justice Stephen subsequently delivering the judgment of the court. In an exhaustive opinion he reviews all the decisions bearing on the point in question and directly overrules

*Cromack* v. *Heathcote, 2 Brod. & B. 4; Rex* v. *Smith, 1 Phil. Ev. 113,* and *Doe* v. *Harris, 5 Car. &. P. 592.*

In the course of his opinion, Mr. Justice Stephen quotes with approval the following remarks by Lord Cranworth in *Follet* v. *Jefferyes, 1 Sim. (N. S.) 1* (at *p. 17*): "It is not accurate to speak of cases of fraud contrived by the client and solicitor in concert together, as cases of exception to the general rule. They are cases not coming within the rule itself: for the rule does not apply to all which passes between a client and his solicitor, but only to what passes between them in professional confidence; and no court can permit it to be said that the contriving of a fraud can form part of the professional occupation of an attorney or solicitor." He also quotes from Sir George Turner, in *Russell* v. *Jackson, 9 Hare 387;* Sir W. Page Wood, in *Gartside* v. *Outram, 26 Law Jour. Ch. 113;* Chief-Justice Cockburn, in *Reg.* v. *Orton,* and Chief-Justice Bovill, in *Tichborne* v. *Lushington,* and thus states the principle to be applied to cases involving the question under consideration.

In order that the rule may apply, there must be both professional confidence and professional employment, but if the client has a criminal object in view in his communications with his solicitor, one of these elements must necessarily be absent. The client must either conspire with his solicitor or deceive him. If his criminal object is avowed, the client does not consult his adviser professionally, because it cannot be the solicitor's business to further any criminal object. If the client does not avow his object he reposes no confidence, for the state of facts, which is the foundation of the supposed confidence, does not exist. The solicitor's advice is obtained by a fraud.

As I understand the case, the rule, in its different phases and the reasons, may be thus stated: If the client consults the lawyer with reference to the perpetration of a crime, and they co-operate in effecting it, there is no privilege, for it is no part of an attorney's duty to assist in crime—he ceases to be counsel and becomes a criminal. If he refuses to be a party to the act, still there is no privilege, because he cannot properly be consulted professionally for advice to aid in the perpetration of a crime.

Matthews *v.* Hoagland.

In the case of a fraud, if it is effected by the co-operation of the attorney, it falls within the rule as to crime, for their consultation to carry it out is a conspiracy, which, on its accomplishment by the commission of the overt act, becomes criminal and an indictable offence.

If the client discloses his fraudulent purpose and the attorney does not join in the scheme, but repudiates all connection with it, there cannot be, properly speaking, professional employment to effect such purpose, and consequently there is no privilege; if the client does not frankly and freely disclose his object and intention, as well as the facts, there is no professional confidence, and consequently no privilege. The application of the rule proceeds on the ground that the privilege is that of the client, and bases his right to claim it, or liability to lose it, on his own conduct; if that has been such that his criminal and fraudulent object and purpose puts him beyond the pale of the law's protection, or if, to conceal his purpose, he has not reposed full confidence in his counsel, he cannot invoke a rule which the law has created, as Lord Brougham said, in *Greenough* v. *Gaskill, 1 Myl. & K. 98*, "out of regard to the interests and the administration of justice."

The question has never been decided in any reported case in this state, and, in my judgment, the rule as laid down by the court of queen's bench should be adopted, not only on account of the great weight of such an authority, but because it puts the question of privileged communications on high ground of honesty and integrity, worthy of the dignity and honor of the profession of the law.

The principal case was on indictment, but the rule is as imperative in civil causes—the only difference being in the method of its application. It would seem that in a civil cause to set aside a fraudulent conveyance or instrument, or to avoid the effect of a fraudulent act, in case the attorney has been, so to speak, a *particeps criminis*, he should be made a party defendant, especially if discovery is sought (*Follett* v. *Jefferyes, 13 Jur. 465, 972, pt. 1; Charlton* v. *Coombes, 32 L. J. Ch. (N. S.) 284; Lewis* v. *Pennington et al., 29 L. J. Ch. 670; Reynell* v. *Sprye,*

*10 Beav. 51; S. C., 11 Beav. 618)*; whatever difficulty there may be in applying the rule in criminal cases, so as not to violate the privilege where it should properly be recognized, there is but little danger of impairing professional confidence in its application in civil cases. Under the authorities, when the question arises on proceedings for discovery, the practice is to take the issue as made by the pleadings as the first test whether the communication involved a purpose which was tainted with fraud.

*Follett* v. *Jefferyes, 13 Jur. 972 pt. 1.* Lord Cottenham discharged a former order made by the Vice-Chancellor on the ground that the pleadings were not so framed as to make a special case, connecting the discovery sought with the fraudulent act complained of, so as to take the case out of the ordinary rule, and the allegations in the answers brought the case within the ordinary rule.

Plaintiffs then amended their bill, making further charges, and the defendants answered and declined to disclose the contents of papers or letters sought on the ground of privilege. *Follett* v. *Jefferyes, 1 Sim. (N. S.) 1.* Lord Cranworth, then vice-chancellor, after stating the case as made by the pleadings, says (at *p. 16*): "This is the account of the transaction, as stated both in the bill and the answer; and, in my opinion, this was not a fraud, according to any definition of fraud which can be recognized in this court."

In *Mornington* v. *Mornington, 2 Johns. & H. 697,* on motion for production of documents, Vice-Chancellor Sir W. Page Wood says: "In this case there is nothing whatever to bring these documents within the rule, that when a fraud is concocted between a solicitor and his client the doctrine of privilege does not extend to protect the communications by which it is effected. The statement (in the answer) is a perfectly good defence against the production of any document so demanded, unless it can be shown that there was such fraud as could take the case out of the reach of privilege."

Do the pleadings in this cause make a case which the court must say involved the perpetration of a crime or fraud? There is really no controversy as to the acts alleged in the bill to have

been done by the persons named. The answers do not deny that after Henry Matthews's death his tin box was opened by Dunham in the presence of his son and daughter, and that certain papers were taken therefrom under the claim that they belonged to those who took them. If Mrs. Hoagland is to be believed, they had a strong claim of right to the possession of the papers. There was nothing wrong in the heirs at law opening the box after the death of their father. To ascertain what they had a right to do was a purpose, not only lawful, but eminently proper for client to consult counsel upon, and for counsel to properly advise the clients with reference to. The evidence, as taken, does not materially change this phase of the case, and I do not think it presents one which requires me to say that it was so tainted with fraud that the rule of professional confidence should not be applied. I do not lose sight of questionable, if not criminal transactions between Dunham and Matthews subsequently, but I ruled, as before stated, that such were not privileged. The present consideration is as to Dunham's knowledge acquired in his employment by Mrs. Hoagland and Matthews and at his early interviews, and as to those I think the rule of professional confidence should be applied. He had made certain statements as to the condition of the certificate before objection was interposed to his testimony, but this comes within the class referred to in *Rowland* v. *Rowland, 13 Stew. Eq. 281,* as being testimony which is excluded on the ground of public policy, and will be disregarded by the court although taken without or before objection.

Other evidence was, however, given of the condition of the certificate of railroad stock.

Complainant called Mrs. and Miss Dunham, the wife and daughter of George W. Dunham, to testify to conversations between John H. Matthews and the said Dunham in the house of the latter. They both testify that John H. Matthews was frequently at the house (Dunham transacting there any law business he had) in consultation with Dunham. Each testifies that she overheard in those conversations that there was no signature to the transfer on the back of the certificate at the time it

·was first taken out of the box; that more than once John H. Matthews said he had traced the signature, holding the certificate ·up to a window; that on one occasion particularly was this said when Matthews called to get Dunham to go with him to Trenton ·to have the stock transferred.

These ladies were subjected to a severe and searching cross-examination, but were not in the least shaken in their testimony, which tended to establish that the transfer of the certificate of railroad stock had not been signed by Henry Matthews. Their testimony; the failure of the subscribing witness to testify that he was a witness to the signing of the instrument by Henry Matthews in his presence; the suspicious circumstance that he could recollect he signed his name at John H. Matthews's request, and yet not recall whether Henry Matthews signed it then; the fact that no witnesses were called as to the genuineness of the signature, are sufficient, in my judgment, to establish this contention of the complainant. Besides this, we have the fact that after the date of this alleged transfer, and when he was sick, Henry Matthews sent his brother, Jordan Matthews, to his son John's house for his box, and that Henry unlocked it and took out certain papers, which he gave him to take to the bank. That he took them to the bank and made collections on them. His testimony is slightly confused because he speaks of coupons, but he several times swore to his best recollection that the money was paid on Camden and Amboy railroad stock. It does appear by the testimony of David P. Smith, cashier of the Lambertville bank, that the dividends on the United Railroad Companies' stock were collected by the bank and passed to the credit of Henry Matthews in July, 1884, and July, 1885, and by Mr. Anderson's testimony that the dividends at that time could only have been collected by Henry Matthews, or by his order, as the stock ·stood in his name. It is therefore established, that after May 19th, 1884, the date of alleged transfer, Henry Matthews not ·only had possession of the certificate, but drew the dividend on ·the stock. There is nothing, therefore, connected with the securities themselves, or their custody, control or use which

rebuts the presumption of their ownership by Henry Matthews, in whose possession they were at the time of his death.

It is claimed, however, that these securities had been given by Henry Matthews in his lifetime to his son and daughter, John H. Matthews and Mrs. Hoagland, that they were at that time delivered by him to them, and afterwards handed to him to keep in the box simply as custodian for them whenever they should be asked for or required.

The evidence upon this point would indicate that the second marriage of Henry Matthews was distasteful to his children, none of whom appear to have been present at the ceremony. On his return from his wedding trip he went to his old home and took dinner, going afterwards to the residence of the complainant, his wife. His son John and the persons who had composed his household before his marriage were still residing at his old place of residence, the whole house, as hereinbefore stated, being after the marriage occupied by the son.

On this occasion he made inquiry for his daughter Mrs. Hoagland, and expressed a desire to see her. She was at that time at her own home in the city or Newark. Her father wrote to her asking her to come to Lambertville, and, in response to that letter, she went there, going to John's house on Saturday and staying over Sunday. As Henry was married on the 10th of November, 1883, this must have been some time about the middle of that month. On Monday afternoon the old gentleman came to the residence of John, and there, in the presence of Miss Sarah Williamson, said to his daughter Mrs. Hoagland and his son John that he wished them to come upstairs, that he had something for them—that he wanted to make them a present. They went upstairs to the room in which the secretary was, in which he kept his tin box. As to what took place there between them we have only the testimony of Mrs. Hoagland; she is the only survivor of those who were present.

It is not denied that at some time Henry Matthews did make a gift to Mrs. Hoagland of two bonds and mortgages which she had executed and delivered to her father for money which she had borrowed from him. Nor is it denied that at some time

Matthews *v.* Hoagland.

Henry Matthews did make a gift to his son John H. Matthews of a piece of property in Lambertville. Mrs. Hoagland insists that the securities in controversy were given by her father to herself and brother at the same time he gave these papers, and with such formalities as to make it a valid gift *inter vivos.* Her testimony was objected to as incompetent.

Is Mrs. Hoagland a competent witness to prove the transaction by which it is alleged her father made a gift of these securities to her brother and herself? If the action had been prosecuted as originally intended, as one by the complainant individually, in her own right, to recover her distributive share in the amount of the estate in controversy, Mrs. Hoagland would have been a competent witness to an interview with the deceased. *Hodge* v. *Coriell, 15 Vr. 456; affirmed, 17 Vr. 354.* But the suit was prosecuted as one by the complainant as administratrix of her husband's estate against her co-administrators, or their representatives and their coadjutors, to bring into administration of said estate property alleged to have been improperly taken therefrom by her co-administrators and Mrs. Hoagland. This course has been permitted because the allegations of the bill are sufficient to sustain the suit as one brought by the complainant in such representative capacity. In such an action Mrs. Hoagland is not primarily a competent witness as to a transaction between herself and her father, nor as to any statements by him. The proviso of the law of 1880 expressly forbids it. But can she testify either in behalf of herself, or a co-defendant, adversely to the representative, as to a transaction between her father and a person other than herself, in which transaction she and her co-defendant are interested, although their interests may be divisible? The proviso reads:

"That this supplement shall not extend so as to permit testimony to be given as to any transaction with, or statement by, any testator or intestate represented in said action." *Rev. Sup. p. 289.*

Mr. Justice Reed, in *Smith* v. *Burnet, 8 Stew. Eq. 314* (at *p. 321*), says: "The object of the restrictive clause in all the statutes

is mutuality. Their purpose is, in the language of Dr. Wharton, to provide that when one of the parties to a litigated obligation is silenced by death, the other shall be silenced by law." No construction should be given to these words which would defeat this purpose unless imperatively demanded by the phraseology of the statute. A casual reading might give the impression that the proviso refers to a transaction between the witness and deceased, and to any statement by deceased to witness or any one else. But why confine the restriction to transactions with the witness, and make it embrace statements to all? The interdicted subjects are classed together, with no apparent intention to apply one rule to acts and another to words. Nor is it necessary to give such confined signification to the provision with reference to transactions; it can properly and grammatically be made to refer to transactions with others as well as the witness, and a construction limiting the restriction of the proviso to transactions with the witness only is destructive of the object named. It would present the anomaly in this case of rendering Mrs. Hoagland incompetent as a witness as to a transaction between her father and herself, but competent as a witness to a transaction between her father and brother, in which she and the brother were alike interested. If he were alive, she would be competent to testify in his behalf, and he in hers, each as to the transactions of the other with the father. I think the reasoning of Vice-Chancellor Bird in *Larison* v. *Polhemus, 9 Stew. Eq. 506,* conclusive, that parties are not competent to testify adversely to one suing in a representative capacity, interchangeably in each other's behalf, each as to a transaction of the other with the deceased, both being interested in the transaction, although such interests are divisible. I am of opinion that the restriction of the proviso of the act of 1880 applies to testimony by a party of transactions of others as well as of those of the witness with the testator or intestate represented in the action, and that Mrs. Hoagland cannot under that act testify as to a transaction involving these securities between her father and brother, either in her own behalf or that of Mrs. Matthews, any more than she could to a transaction with herself.

Has she been made competent by the complainant, suing as she does as an administratrix, giving evidence which puts her in the position of a witness under the earlier law of 1874?

Mr. Justice Van Syckel, in stating the opinion of the majority of the court of errors and appeals in the case of *McCartin* v. *McCartin, 18 Stew. Eq. 265*, has fixed the construction to be given to the two acts of 1874 and 1880.

On page 267 he says of the act of 1880, it was intended to give each party an equal privilege without subjecting the one (to wit, the administrator) to the disadvantage of letting in the other to testify to matters of which the administrator could know nothing personally. To this extent the act of 1880 modified the earlier law, the alteration being to partially qualify each party without reference to the action of the other. Thus, if the representative offers himself as a witness for this limited purpose it does not enable the adversary to gain the position of vantage. But if the representative offers himself under the earlier law, and is examined as a witness for all purposes, the other party has the same right to testify without restriction.

Again, no necessary conflict arises between this (act of 1880) and the prior enactment on the subject upon which a repeal by implication can arise. The representative may still avail himself of the right to testify generally under the law of 1874, and thereby render his adversary competent to a like extent. In that case it is not the act of 1880 which permits the wider range of evidence but the express language of the earlier law.

The proviso in the act of 1880, he (at *p. 267*) says, is a limitation only upon the operation of the act of 1880; it simply circumscribes the extent to which testimony may be given under that act.

Mr. Justice Van Syckel (at the foot of *p. 268*) further says: " My conclusion is, that if the representative offers himself as a witness, and testifies to *any* transaction with, or statement by, the testator or intestate, the other party may be a witness on his own behalf as to *all* transactions with, or statements by, such testator or intestate, which are pertinent to his case." Obviously the only test which can be applied to ascertain if the representative offers

himself as a witness under the act of 1874 is that in testifying he oversteps the boundary fixed in the act of 1880. Under the last-mentioned act he is a competent witness to all purposes except to testify to any transaction with, or statement by, the testator or intestate. So that, if his testimony does not extend beyond that prescribed limit, the law will assume he is testifying under the act of 1880. If, however, he goes one step further, the act of 1880 ceases to be enabling, and the representative must then be assumed to have elected to testify under the act of 1874.

The complainant, the representative in this case, was called by her counsel as a witness in her own behalf, and, among other things, testified as follows :

"*Q.* You are the complainant in this case?
"*A.* Yes, sir.
"*Q.* And the widow of the late Henry Matthews?
"*A.* Yes, sir."

And later on—

"*Q.* When were you married?
"*A.* November 10th, 1883."

Also, as follows :

"*Q.* Do you know of his (Henry Matthews) sending for a box?
"*A.* Yes, sir.
"*Q.* What box was that?
"*A.* A small tin box.
"*Q.* Whose was it?
"*A.* Mr. Henry Matthews'.
"*Q.* What did the box contain?
"*A.* I didn't see anything but papers; I didn't see what they were.
"*Q.* Did you or not see Mr. Matthews take any papers out of the box?
"*A.* Yes, sir.
"*Q.* What did he do with them?
"*A.* Gave one to his brother.
"*Q.* Which brother was that?
"*A.* Jordan.
"*Q.* Did Jordan Matthews go away with the papers in his hand?
"*A.* Yes, sir.
"*Q.* Did he bring back any money?

Matthews *v.* Hoagland.

"*A.* Yes, sir.
"*Q.* What did he do with it?
"*A.* Gave it to my husband.
"*Q.* Who kept the key of that box?
"*A.* Mr. Matthews."

Jordan Matthews had already testified to the transaction with reference to the box, and the incident was introduced to show that after the alleged gift of the securities by the father he was collecting the interest coupons and dividends on the bonds and stock. The fact of complainant's marriage with the deceased as averred in the bill was met in the answer of the defendants with an admission "that the complainant and said Henry Matthews lived together as husband and wife at the time of the death of said Henry Matthews," but as to the fact, date or place of marriage &c., the defendants deny any knowledge or information other than derived from the complainant's bill and newspaper notices.

The incident of the box was a material point in the case, and the fact of the marriage, in the event of complainant's establishing her position, would become essential, if it should be determined that the case should be finally disposed of in this court. Complainant was not competent under the act of 1880 to testify to the marriage, a transaction by herself with the intestate, nor to the incident of the box, a transaction with Jordan Matthews, even if her account of it does not involve testimony of statements by the deceased, but it was competent for her to so testify under the act of 1874, and having done so she made her election to testify under that act which carried with it all of its consequences. Under that law an administrator or executor cannot offer himself on his own behalf to prove the most formal matter without making the other party a witness for all purposes, so that the complainant, by overstepping the line drawn in the act of 1880, opened the door wide to all testimony of the defendants or either of them.

Mrs. Hoagland's statement of the transaction is, that she being at her home in Newark, her father, shortly after his return from his wedding trip, sent by letter for her to come to see him.

That she went to Lambertville and met him at his old home; that he told John and herself to come upstairs, he had something for them. They went upstairs with him and into his bedroom; he took his box out and took these papers out of the box and handed them to them; he handed her brother a deed and gave her the bonds and mortgages he held against her—he handed these papers to them and said, "Here, take these, life is uncertain and they are yours; this is part of your mother's estate, and I want you to have them whilst I am living;" that this was said with reference to papers other than the bonds, mortgages and deed is shown by its substantial repetition in answer to a question as to what her father said when he handed her or John the securities in the bed-room, and afterwards that the Lehigh Navigation and Camden and Amboy railroad and the Cedar Rapids bonds, which Dunham took out of the box, and which were claimed by her brother and herself, were the same stocks and bonds which her father had talked about to her and handed her in the bed-room. On her cross-examination she repeats the statement and says her father, besides the deed, then delivered to John the railroad stocks; that she did not have them in her hands, but that John had the deed and the other papers, the stock, the Lehigh Navigation bond, and the Camden and Amboy and the Burlington and Cedar Rapids bond; that she saw them in his hands; that John read them over as his father handed them to him.

In her account of the subsequent part of the transaction, something was said about the securities being undivided; she does say that her father intended to deal equally with her brother and herself, and I understand that the statement as to the securities being undivided, meant that they were in such amounts that they were not susceptible of being equally divided, so that each could take a moiety. She said she did not want to use hers then, and John said he did not want his, and they both said they did not want them then, and asked their father to keep them, and gave them back to him, and said that the one who might want them afterwards could call for them and get them when

so wanted.    That he put them back in the box and put the box in the secretary.

His collecting the interest and dividends after this interview is evidence of control over them, which, unexplained, would tend to prove the exercise of assumed ownership, but it is not inconsistent with the idea that he held these securities for his son and daughter, and especially is this so, if, as Mrs. Hoagland says, he sent her the same whenever she wanted it.    They were father and daughter, and it is not strange that neither kept accurate, or any, account of the payments.

Mrs. Hoagland, as to the fact of the interview between her father and her brother and herself, and that it was brought about by her father, and was for the express purpose of his giving something to his children, is corroborated by the testimony of Mrs. Hart and Mrs. Williamson.

It was admitted on the argument that the evidence established such an interview and purpose, and that on that occasion the bonds and mortgages and deed were given by old Mr. Matthews to his daughter and son.    Her statement of giving the papers to her father for safe custody, to be given up to them when wanted, is in a measure corroborated by the fact that her mortgages were cancelled of record January 15th, 1884, two months after the alleged gift, and two years prior to her father's death, and that John's deed, which was dated August 13th, 1883, and acknowledged September 24th, 1883, was recorded March 17th, 1885, ten months before his father's death.

It is said, however, with some force, that while all this may be true, it is also consistent with the theory that a gift was made which embraced only the deed and bonds and mortgages.    To accede to this proposition it must be assumed that Mrs. Hoagland has willfully and deliberately committed perjury in her statement as to the gift, if such it was, of the other securities.    There can be no mistake invoked to explain the testimony of the transaction ; it must be founded on fact, or is pure fiction concocted for the purpose of personal gain, and told under the solemnity of her oath.    I cannot give my assent to this charge.    Mrs. Hoagland's testimony on the stand impressed me with its truthfulness ; it was

31

given with an air of sincerity and candor which indicated that it was the statement of a lady who is truthful, and who had no desire to add to or take from the exact occurrence.

The circumstances surrounding the taking of these securities do not indicate, to my mind, an intent on Mrs. Hoagland's part to take what was not her own, or intentionally what she was not legally entitled to. The contention of complainant is, that she has taken her father's securities illegally, and committed perjury to justify her act. Does the case call for such a conclusion?

These securities were in the box of Henry Matthews at the time of his death; that box was opened in the presence of these defendants by George W. Dunham, and they were separated from the other property of the intestate, and converted to their own use under a plea of ownership. If the defendants were not given these securities, as they claim, by their father, it was an illegal and improper taking of the property of the estate. It is proved that Mrs. Hoagland would not take any action until the advice of counsel could be had. It is undisputed that she brought George W. Dunham to the house; he was a counselor-at-law, regularly admitted, and practicing in this state, who had frequently been employed by her as her legal adviser. Now, if it had been the intention of Mrs. Hoagland to pilfer the securities of her father, to take those which she had no shadow of claim to, there seems to be no reason why she would go or send all the way from Lambertville to Flemington for her former and trusted counsel, to consult with him as to what course she should pursue in order to steal property belonging to her father's estate. It appears that when Dunham got there and brought the box into the room, it was unlocked by Dunham with a key which he had in his possession. If she was stealing, there was no reason for her to confine the operation to the stock of the Camden and Amboy railroad, as there were certificates of stock of other corporations which she did not claim. The testimony is, that Dunham opened the box; that he told those present not to touch the contents; that as he took out the papers one by one, they were either claimed or disclaimed by Mrs. Hoagland and by John H.

Matthews; that all she did was in accordance with Dunham's advice.

The transaction, its publicity, the employment of counsel, her acting on his advice, the selection of a part only of the securities, all tend to relieve these parties of a charge of criminality; the act was unwise and reprehensible, but it was the result of their misfortune in selecting counsel who would advise that the strong box of the dead man, before administration, should be opened by himself with his own key, and that the securities therein found should be distributed among the heirs at law, without any other evidence of ownership than their claim.

I do not find in the transaction of taking the securities, nor in seeming discrepancies in her evidence, as to collateral matters, with that of other witnesses, sufficient to justify the conclusion that she has not told the truth as to the interview with her father.

It is true there are contradictions between Mrs. and Miss Dunham and herself, as to alleged remarks made at the dinner table and in conversations at their home, but such differences continually appear on a trial, and may be reconciled or explained in many ways, without the imputation of perjury. There is flat contradiction between George W. Dunham and herself on a point as to which his testimony is competent, viz., the time she went from Lambertville to Flemington for him. If she was not corroborated by Mrs. Hart and Miss Williamson and Mrs. John Matthews, I would have no hesitation in believing her statement and disbelieving his. There is some evidence which would indicate that her statement that George W. Dunham was not at her brother John's house on Sunday, January 24th, is not correct. Mrs. Dunham testifies to her husband's coming home late on a Sunday night, having an envelope containing Burlington and Cedar Rapids bonds, and recognizes the envelope and says that he went away with it the next day, ostensibly to Newark, and there is evidence that this bond was cashed at the North Ward bank, in Newark, for A. P. Hoagland. Dunham swears it was on Monday, January 25th. He is contradicted by the evidence of the bank officer which makes it probable it was on January

26th, the day of Henry Matthews's funeral. Opportunity was given complainant to take testimony to make this clear, but it was not taken advantage of. As the testimony stands there is no clear, competent or reliable evidence that the deposit of that date to A. P. Hoagland's credit was the proceeds of these bonds. Again, Dunham may have been there before without Mrs. Hoagland's knowledge. He swears he was, and that she knew it and was present; her denial can go only to her knowledge and presence. When the box was opened and the securities taken, it was unlocked by Dunham with a key he seemed to know would fit the lock. It is possible John and Dunham may have previously taken these Cedar Rapids bonds when Mrs. Hoagland was not there. If so, the inconsistencies disappear.

It is, however, a discrepancy with reference to a date, intimately connected it is true with an event calculated to fix it on the mind, yet I cannot say it is not one about which one might not be honestly mistaken.

There is much in the manner of a witness on the stand which carries conviction of his or her credibility which it is impossible to adequately describe. Mrs. Hoagland gave her testimony in a frank and apparently candid manner, with enough of hesitation to show she was not reciting a well prepared story, and passed through a cross-examination calculated to perplex her, without confusion or apparent contradiction, leaving the impression stated before that she had spoken the truth.

Assuming that her account of the transaction between her father and her brother and herself is reliable, what was its legal effect as to the ownership of the securities in question?

The development of the law with reference to the subject-matter of gifts, and what is necessary to effectuate their purpose under changed conditions of the incidents of property rights, and the procedure of courts to enforce them, has been such that it now embraces almost every kind of personal property, whether of a corporeal or incorporeal nature, and has rendered obsolete many formalities which were formerly required. The evolution from its ancient operation, only on chattels passing by manual delivery, to its present comprehensive scope, is traced in *notes to*

*Ward* v. *Turner*, 1 *White & T. Lead. Cas.* \*1058; to *Ellison* v. *Ellison*, 1 *White & T. Lead. Cas.* (*T. B. series*) \*313 *et seq.*; to *Austin* v. *Mead, Brett Lead. Cas.* \*122; to *Bradley* v. *Hunt*, 23 *Am. Dec.* 597; to *Flanders* v. *Blandy, Am. L. Reg.* (*Vol. 26, N. S.*) 581; 2 *Spenc. Eq. Jur.* \*895 *et seq.*

To constitute a valid gift *inter vivos*, there must be such a transfer of the subject-matter as will pass the donor's title at once to the donee, absolutely and irrevocably, divesting the former of, and investing the latter with, all of the donor's right or title therein, and control and dominion thereof. 2 *Blacks. Com.* 441; 2 *Kent Com.* \*438, \*439; *May Fraud. Conv.* (*T. B. series*) \*403; *Jackson* v. *Twenty-third Street Railway*, 88 *N. Y.* 520, 526; *Young* v. *Young*, 80 *N. Y.* 422.

The actual delivery of bonds, known in the market as transferable by delivery, made by one holder to another, for value, under all the authorities, passes the title, or if delivered, with words or acts indicating a present absolute gift, constitutes a valid gift *inter vivos*. *Morris Canal* v. *Fisher*, 1 *Stock.* 667; *Morris Canal* v. *Lewis*, 1 *Beas.* 323; *Boyd* v. *Kennedy*, 9 *Vr.* 146; notes to *Miller* v. *Race*, 1 *Sm. Lead. Cas.* 746; *London and C. Banking Co.* v. *London and R. B., L. R.* (21 *Q. B. Div.*) 535.

The bonds known as Burlington and Cedar Rapids Railroad and Lehigh Navigation Company were of that character, and their actual delivery by Henry Matthews to John H. Matthews for himself and his sister, who was present assenting thereto, accompanied by the declarations testified to by Mrs. Hoagland, passed the title from him to them and constituted the transaction a completed gift.

If the gift is complete, the whole title of the donor has passed from him to the donee, and the subsequent redelivery of the subject-matter of the gift to the donor, to keep for the donee, will not disturb the title of the latter in the thing given. *Grover* v. *Grover*, 24 *Pick.* 261; *Whitford* v. *Horn*, 18 *Kan.* 455; *Ector* v. *Welch*, 29 *Ga.* 443; *Darby* v. *Rector*, 10 *Ark.* 211; *Ivey* v. *Owens*, 28 *Ala.* 641; *Easly* v. *Dye*, 14 *Ala.* 158.

Matthews v. Hoagland.

With reference to the formalities necessary to effectuate the gift of non-negotiable securities, the law is in a less satisfactory and settled condition. The question as to the alleged gift of the shares in the Camden and Amboy Railroad Company is therefore not so easy of solution. These shares are on the face of the certificate in the name of Henry Matthews, and declared to be "transferable only by him, or by his legal representatives, on the books of the company, on the surrender of this certificate." The certificate has on its back a printed blank assignment and power of attorney for the transfer of the stock by the record owner.

The provisions of charters, or of by-laws, under the statute (*Rev. p. 181 § 26*), that stock of the corporation shall be transferable only on the books of the company, are held to be intended merely for the protection of the company.

It is settled that one in possession of a certificate of stock in an incorporated company, accompanied by an assignment in blank, executed by the record owner, with an irrevocable power of attorney, authorizing the transfer of the stock, is presumptively the equitable owner of the shares, whose title thereto cannot be impeached if he has given value for them without notice of any intervening equity. *Rogers* v. *New Jersey Insurance Co.*, *4 Halst. 167*; *Broadway Bank* v. *McElrath, 2 Beas. 24*; affirmed in *Hunterdon County Bank* v. *Nassau Bank, 2 C. E. Gr. 496*; *Mount Holly Co.* v. *Ferree, 2 C. E. Gr. 117*; *Pratt* v. *Tilt, 1 Stew. Eq. 479*; *Del. & Atl. R. R.* v. *Irick, 3 Zab. 321*; *State, Bush,* v. *Warren F. Co., 3 Vr. 439*.

The reason of the rule is, that the record owner has done everything in his power to effect the transfer, and by such act has assigned all interest he may have had, and surrendered all *indicia* of ownership—as to third parties, holders for value, he is estopped from asserting ownership (*McNeil* v. *Tenth National Bank, 46 N. Y. 325*; *Williams* v. *Col. Bank, L. R. (38 Ch. Div.) 388*; affirmed *L. R. (15 App. Cas.) 267*—as to volunteers, the gift is complete and irrevocable if *inter vivos*.

In England, stocks, shares, bonds, debentures and other securities which are not assignable at law unless duly transferred, must

be duly transferred, and not merely assigned or covenanted to be transferred, to constitute a valid gift. *May Fraud. Conv. \*413; Antrobus* v. *Smith, 12 Ves. 39 ; Dillon* v. *Coppin, 4 Myl. & C. 647; Searle* v. *Law, 15 Sim. 95.* The Companies Clauses act of 1845 requires such assignments to be by deed, and to be delivered to the officer of the company, without which formalities the legal title will not pass *Nanney* v. *Morgan, L. R. (37 Ch. Div.) 346.* The English cases proceed on the ground that the title not having passed by a legal assignment, equity will not interfere to enforce an equitable title of a volunteer.

The same is the effect of the decisions in Maryland, unless the transfer is made complete in the lifetime of the donor, on the ground that the power of attorney does not survive him (*Pennington, Admr.,* v. *Gitting's Exrs., 2 Gill. & J. 209 ; Balt. Retort and Fire Brick Co.* v. *Mali, 65 Md. 93*), while in other states the mere delivery without endorsement or written assignment of the certificate of stock with words of gift are held sufficient. *Commonwealth* v. *Crompton (Pa.), 20 Atl. Rep. 417 ; Ridden* v. *Thrall (N. Y.), 26 N. E. Rep. 627 ; Hopkins* v. *Manchester (R. I.), 19 Atl. Rep. 243.*

*Smith* v. *Burnet, 8 Stew. Eq. 314,* in the court of errors and appeals, on the question of gift, turned on the point that there was no such delivery of the stock as implied an intention, on the part of the donor, to give it absolutely, or to abandon control of its proceeds.

The ordinary, in *Dilts* v. *Stevenson, 2 C. E. Gr. 407* (at *p. 413*), says : " To constitute a perfect gift the donor must part with the possession and dominion of the property. And if the thing given be a chose in action, the law requires an assignment, or some equivalent instrument, and the transfer must be actually executed "—citing *2 Kent Com. \*439.* The rule, thus broadly given in the last sentence, has undoubtedly, since Chancellor Kent so stated it in his commentaries, been greatly relaxed in many jurisdictions with reference to money obligations, and in others to all choses in action, while Judge Grover, in *Gray* v. *Barton, 55 N. Y.* (at *p. 73*), quotes the same extract with approval. In many cases in that state the principle seems to be disregarded.

There is great diversity of opinion evinced by the decisions in other jurisdictions, but I am unable to find any authority in this state which would indicate a departure from the principle stated.

The relaxation of the rule elsewhere seems to have resulted from the ruling as to money obligations, and gifts *causa mortis*.

There seems, however, to be every reason why it should be adhered to in a case of an alleged gift *inter vivos* of stock, both from the nature of the subject-matter, and from the incidents of such gifts.

There is a wide difference in the character of property in shares of stock and that in money obligations.

Chief-Justice Shaw, in *Fisher* v. *Essex Bank, 5 Gray 373* (at *p. 377*), speaking of the character of property in shares of stock, and wherein it differs from a money obligation, says: "A nearer analogy, perhaps, is that of a chose in action, capable, like this, of being assigned in equity, by a delivery over of the certificate, which is the assignor's muniment of title, with an assignment duly executed, transferring to the assignee all the assignor's right, title and interest. And yet it is not like the assignment of a chose in action, which is the transfer of the assignor's interest in a debt, and vests in the assignee an equitable right to collect the debt in the name of the assignor.

"The right is, strictly speaking, a right to participate, in a certain proportion, in the immunities and benefits of the corporation; to vote in the choice of their officers, and the management of their concern; to share in the dividends of profits, and to receive an aliquot part of the proceeds of the capital, on winding up and terminating the active existence and operations of the corporation. Again, when a transfer is rightfully made and complete, it vests a right in the transferee not merely to act in the place of the vendor and in his name, but substitutes him, in all respects, as the legal and only holder of the shares transferred to the same extent to which they were before held by the vendor. The title, therefore, by which such interest is held is strictly a legal title; it is created and defined by law; its benefits are secured by law; it is transferable by operation of law, and may be attached on

Matthews *v.* Hoagland.

mesne process and seized on execution and sold by legal authority
·to satisfy the debts of the owner."

The incidents of gifts *inter vivos* call for the observance of the
·rule as laid down by Chancellor Kent.   Cogent reasons are given
by Mr. Justice Gilbert in *Johnson* v. *Spies, 5 Hun 468,* why the
law might well overlook an informality or incompleteness in a
gift *causa mortis,* which it would not tolerate in respect to a gift
·inter vivos.   *15 Alb. L. J. 40.*

A gift *inter vivos* must be complete *in presenti;* it has no
reference to the future; there must be a delivery, and it must be
·an actual one, "so far as the subject is capable of delivery.   It
·must be *secundum subjectam materiam,* and be the true and effect-
·ual way of obtaining the command and dominion of the subject."
·*2 Kent Com. \*439.*

In *Basket* v. *Hassell, 107 U. S. 602,* Mr. Justice Matthews
·(at *p. 614*) says : "The point which is made clear by this review
·of the decisions on the subject, as to the nature and effect of a
·delivery of a chose in action, is, as we think, that the instrument
·or document must be the evidence of a subsisting obligation, and
be delivered to the donee, so as to vest him with an equitable title
·to the fund it represents, and to divest the donor of all present
·control and dominion over it, absolutely and irrevocably, in case
·of a gift *inter vivos,* but upon the recognized conditions subse-
·quent, in cases of a gift *mortis causa;* and that a delivery which
does not confer upon the donee the present right to reduce the
fund into possession by enforcing the obligation, according to its
terms, will not suffice."

As delivery is necessary to the validity of a gift *inter vivos,*
·and as the certificate of stock is the only thing connected with
its ownership that is capable of manual tradition, it would seem
·that an assignment and power to transfer, which are necessary to
make the certificate at once available, inheres in its effectual
·delivery.

There appears to be a controlling distinction between a transfer
·involving the delivery of a certificate of stock with an assign-
ment and power to transfer the shares, with words of gift, and a
·delivery of the certificate unassigned and unaccompanied by an

Matthews v. Hoagland.

act or writing empowering its transfer; for a gift *inter vivos* being incomplete so long as any act of the donor remains undone which is necessary to confer on the donee the power of the present control and enjoyment of the subject of the gift, the failure of the record owner of the stock to clothe the donee with the means of at once acquiring the benefits of the stock, leaves unperformed an act which prevents the gift from taking effect *in presenti* which is vital to it as a gift *inter vivos*.

Again, it is necessary to the validity of a gift *inter vivos* that all of the title of the donor, whatever it may be, should be transferred at once to the donee. He cannot retain any interest therein without destroying its character as a gift. *Young* v. *Young, 80 N. Y. 422.*

The handing over of a certificate of stock without a written assignment or power certainly does not transfer the legal title. If we admit it confers an equitable title, the legal has remained in the donor, and cannot be enforced, for equity recognizes and makes effective only assignments founded on a valuable consideration and does not aid a volunteer. *May Fraud. Conv. \*406; Weale* v. *Ollive, 17 Beav. 252.*

Nor under the decisions will equity build up a trust with the fragments of an incomplete gift. *Antrobus* v. *Smith, 12 Ves. 39; Richards* v. *Dolbridge, L. R. (18 Eq. Cas.) 11; Moore* v. *Moore, L. R. (18 Eq. Cas.) 474; Milroy* v. *Lord, 4 DeG., F. & J. 274; Heartley* v. *Nicholson, L. R. (19 Eq. Cas.) 233; Young* v. *Young, supra.*

In my judgment the character of the property in shares of a corporation, as well as the distinctive qualities of a gift *inter vivos*, forbid a departure from the rule, that a valid gift of such property cannot be made by the delivery of the certificate of stock, without formal transfer, or an assignment and power in writing to transfer the shares.

But, independent of the legal question, the rule that the possession of the certificate assigned or accompanied by authority to transfer is evidence of ownership, is now the recognized law of all mercantile communities in this country, and under it all transactions in the sale or pledge of stocks are carried on. The usage

is so universal that the transfers are printed on the certificates, as on the one in question. If the decisions in this state did not seem to require an assignment in writing, I would be satisfied that the failure of Henry Matthews to execute the transfer and power of attorney on the back of the certificate, was conclusive evidence that he did not intend to make a present gift of the stock, and to divest himself of all control and dominion over it or its proceeds. There was no haste in the matter; he had taken the time to execute the deed to John Matthews with all formality; he, it must be assumed, knew that the company would require his assignment in writing to transfer the stock, and notwithstanding anything he may have said indicating an intention to give it, the fact of his not making the paper effective shows that he intended to retain some dominion over the property. If so, it is fatal to the transaction as a gift *inter vivos.* The stock of the Camden and Amboy railroad I am of opinion was not effectually given by the intestate, and belonged at his death to his estate.

There is no competent evidence whatever that the note of Vincent R. Matthews and the currency in the box were not the property of the intestate; they, with the Camden and Amboy railroad stock, must be held to have belonged to the estate of Henry Matthews, and to have been improperly diverted by John H. Matthews, and it is undisputed that the defendants Mary E. Hoagland and Helen Matthews have each come into the possession of part of the proceeds.

The jurisdiction of this court over the accounts of administrators, and to enforce rights of parties in the estates of decedents, is well settled. *Frey* v. *Demarest, 1 C. E. Gr. 236; Dorsheimer* v. *Rorback, 8 C. E. Gr. 46; Suydam* v. *Bastedo, 13 Stew. Eq. 433; Coddington* v. *Bispham, 9 Stew. Eq. 574.* So, also, is the jurisdiction of the court to entertain a suit by an administrator, against a co-administrator, and to decide questions as to the fact of indebtedness. *Ransom* v. *Geer, 3 Stew. Eq. 249; Petty* v. *Young, 16 Stew. Eq. 654.* Such an action may also be maintained, when the defendant administrator has been guilty of misconduct, which jeopardizes the rights of those interested

in the estate (*Wood* v. *Brown, 34 N. Y. 337*), as explained in *Burt* v. *Burt, 41 N. Y. 46*.

This case is, that John H. Matthews, an administrator of his father's estate, took securities and money belonging to the estate and converted them to his own and his sister's use, making no return of them to his co-administrators, either in the inventory or the final accounting. His sister was not an administratrix, and he is deceased, leaving his widow his sole devisee, legatee and executrix. It is peculiarly a case for the exercise of the jurisdiction of this court over administration of estates. The estate is entitled to have an accounting with respect of the shares of stock, the note of Vincent R. Matthews and the currency. The debts of the intestate have all been paid, the balance found in the hands of the administrators by their accounting in the orphans court has been distributed, there is no other disposition to be made of the property declared by this suit to belong to the estate, and heretofore unadministered, but to distribute it according to law—all parties entitled thereto, and chargeable therewith, are parties to this suit, and as the decree can adjust the respective rights of all interested therein, it should so provide. *Mallory* v. *Craige, 2 McCart. 73 ; Youmans* v. *Youmans, 11 C. E. Gr. 149*.

The evidence tended to show that the note of Vincent R. Matthews was used partly to settle a debt of John H. Matthews, and partly one of the intestate. So far as it was properly used, allowance should be made. The weight of evidence is that the currency amounted to $100. The value of the Camden and Amboy railroad stock was to be agreed upon, but if the parties cannot come to an agreement as to this value and the amount to be charged on account of the Vincent R. Matthews note, I will take testimony to determine the same.