STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JAMES V. TOSCANO, JR., DEFENDANT-APPELLANT.

Argued September 21, 1953—Decided October 26, 1953.

*Mr. Marlin J. DiMaria* argued the cause for appellant (*Messrs. DiMaria & DiMaria,* attorneys).

*Mr. David H. Harris* argued the cause for respondent (*Mr. Theodore D. Parsons,* Attorney-General and *Mr. Albert M. Ash,* Deputy Attorney-General, attorneys).

The opinion of the court was delivered by

JACOBS, J.   The defendant was convicted in the Bergen County Court on an indictment which charged false swearing in violation of *R. S.* 2:157–4.   He appealed to the Appellate

Division and the cause has been certified to this court under R. R. 1:10–1(a).

On May 11, 1951 Charles Astore, John McLaughlin, William Malone and Joseph Mello were indicted for book-making. On the same day Anthony Astore, a brother of Charles Astore, was also indicted for conspiracy to make book at the residence of Russell Pontilli. The defendant, an attorney-at-law, had theretofore represented the Astores and appeared with them at their arraignment on May 11. On May 31, 1951 the defendant appeared, pursuant to subpoena, before the grand jury which was investigating gambling activities in Bergen County. He was duly sworn as a witness and testified without raising any objection or claim of privilege. He stated that he was representing the Astores and was first interrogated with reference to an appearance he had made in 1950, in the company of Charles Astore and McLaughlin, Malone and Mello, before the Kefauver Committee at Foley Square, New York City. He testified that Charles Astore had called and asked him to represent him before the committee and that some time later McLaughlin, Malone and Mello came to his office. Immediately thereafter he testified that although Charles Astore had come to his office the other three had not come to his office but had telephoned him. In fact, the other three neither telephoned him nor did they come to his office; Charles Astore had retained him to appear and later asked him also to represent the other three. The defendant did not see or speak to McLaughlin, Malone or Mello prior to the date of their appearance before the committee.

The defendant was next interrogated before the grand jury with respect to the posting of bail for Russell Pontilli. He testified that he gave his personal check for the bail bond and was paid by Pontilli's partner "Mr. Capelli or Mr. Capasoli; I don't know his name." He denied that Astore paid him for the bond and reiterated that Pontilli's partner named Capelli or Capasoli, and whom he did not know, had made the payment. In fact, Anthony Astore had paid for the bail bond and neither Pontilli, a janitor at the

Washington School nor Passoretti, another janitor who worked with him at the school and was known as his partner, made any payment towards the bail.

In June 1951 the defendant was indicted for false swearing in violation of *R. S.* 2:157–4. In substance, the first count charged that the defendant swore falsely when he testified that McLaughlin, Malone and Mello had called him; and the second count charged that he swore falsely when he testified that the man who paid the bail bond premium was Passoretti, Pontilli's partner, a man whom he did not know. In December 1951 the defendant voluntarily appeared and made a sworn statement before the Deputy Attorney-General and in the course thereof he admitted the falsity of his testimony and disclosed the true circumstances. *Cf. State v. Kowalczyk*, 3 *N. J.* 51 (1949). At the trial he did the same but sought to exculpate himself on the ground that when he appeared before the grand jury he mistakenly conceived that he owed a duty to his clients, the Astores, to conceal the real facts with respect to the identities of the person who retained him to represent McLaughlin, Malone and Mello and the person who furnished the bond premium for Pontilli. The trial court submitted to the jury the issue of whether the defendant did willfully swear falsely and, after the verdict of guilty was returned, declined to set it aside. On the present appeal the defendant advances several grounds of alleged error which will be considered *seriatim*.

## I.

The first contention is that the grand jury "had no legal existence" because it compelled the defendant to testify as to matters which were privileged and tended to incriminate him. We find no basis whatever for this position. The grand jury was at all times legally constituted, was properly engaged in an investigation of gambling activities in Bergen County, and duly issued its subpoena to the defendant. He appeared as a witness and was interrogated on matters which were sufficiently related to the investigation. See *In re*

*Pillo,* 11 *N. J.* 8, 17 (1952). *Cf. R. S.* 2:157–6—now *N. J. S.* 2A:131–6. If any of the questions addressed to him sought to elicit information which was immune from disclosure either under the privilege against self-incrimination or the attorney-client privilege, he could have asserted the claim of privilege and refused to answer. He did neither but, instead, answered the questions falsely. This course was entirely beyond the pale of law and morals and subjected the defendant to prosecution for false swearing without regard to whether the information was privileged. *Cf. People v. Doe,* 226 *Mich.* 5, 196 *N. W.* 757, 759 (*Sup. Ct.* 1924), where Justice Fellows noted that he did "not think the question of privileged communications is involved in this case. The plaintiff in *certiorari* was not committed for refusing to answer questions, but was committed for answering questions falsely and evasively."

The history, policy and limits of the privilege against self-incrimination and the attorney-client privilege have been extensively dealt with elsewhere. See 8 *Wigmore, Evidence* (*3d ed.* 1940), 276, 542. See also *In re Vince,* 2 *N. J.* 443, 455 (1949); *Board of Health of Weehawken Tp. v. New York Central R. Co.,* 10 *N. J.* 284, 288 (1952); *In re Pillo, supra; Matthews v. Hoagland,* 48 *N. J. Eq.* 455 (*Ch.* 1891); *State v. Loponia,* 85 *N. J. L.* 357, 360 (*E. & A.* 1913); *State v. Krich,* 123 *N. J. L.* 519 (*Sup. Ct.* 1939). Although our State Constitution contains no express provision embodying the privilege against self-incrimination, it is firmly embedded in our common law and has been codified in our statutes. *Board of Health of Weehawken Tp. v. New York Central R. Co., supra.* It is a personal privilege which must be asserted by the witness; if the testimony is given without claim of the privilege, it is permanently waived. See *Wigmore, supra,* 388. Furthermore, the claim of privilege may be overruled by the court where it appears that there is no reasonable ground to apprehend danger to the witness from his being compelled to answer. *In re Pillo, supra,* 11 *N. J.* 19. In the instant matter the information sought by the grand jury from the defendant could not

incriminate him and, in any event, he testified freely without claiming the privilege.

The attorney-client privilege is likewise firmly embedded in our common law, although not embodied in either constitutional or statutory provision. See *Matthews v. Hoagland, supra; State v. Loponia, supra; State v. Krich, supra.* It is the oldest of the privileges for confidential communications and though its early origins involved consideration for the oath and honor of the attorney it is now universally recognized as resting upon the policy in favor of affording to the client freedom from apprehension in consulting his legal adviser. *Wigmore, supra,* 547. Since the protection of the privileged communication is not for the lawyer but for the client (*Russell v. Second National Bank of Paterson,* 136 N. J. L. 270, 278 (*E. & A.* 1947)), waiver thereof rests with the client. *State v. Loponia, supra,* 85 N. J. L. 360; *Wigmore, supra,* 625. If called as a witness, the attorney is duty bound to assert the privilege where applicable unless it has been waived by his client. See *Canons of Professional Ethics,* 37; 58 *Am. Jur.* 259 (1948). If the claim of privilege is finally overruled the testimony must, of course, be given. However, it seems hardly conceivable that we are called upon to note that the attorney may not under any circumstances evade, or falsify as did the defendant here, for the supposed protection of his client.

Doubt may be expressed as to whether the information sought to be elicited from the defendant actually came within the protection of the attorney-client privilege. Most of the authorities hold that while the privilege protects against the disclosure of confidential communications from the client to his attorney, it is not intended to permit concealment by the attorney of the identity of his client. See *Behrens v. Hironimus,* 170 F. 2d 627 (*C. C. A.* 4, 1948); *United States v. Pape,* 144 F. 2d 778 (*C. C. A.* 2, 1944), *certiorari* denied 323 *U. S.* 752, 65 *S. Ct.* 86, 89 *L. Ed.* 602 (1944); *People ex rel. Vogelstein v. Warden of County Jail,* 150 *Misc.* 714, 270 *N. Y. S.* 362 (*Sup. Ct.* 1934), affirmed 242 *App. Div.* 611, 271 *N. Y. S.* 1059 (*App. Div.* 1934);

*Wigmore, supra,* 607; *Tomlinson v. United States,* 68 *App. D. C.* 106, 93 *F. 2d* 652, 114 *A. L. R.* 1321 (1938). But see *Ex Parte McDonough,* 170 *Cal.* 230, 149 *P.* 566, *L. R. A.* 1916C, 593 (*Sup. Ct.* 1915). In the oft-cited *Vogelstein* case, *supra,* an attorney had appeared in the magistrate's court for 15 defendants charged with lottery violations. Many of the defendants later voluntarily testified before a grand jury that they had never employed him and had never paid him for his services. Thereupon the attorney was called before the grand jury and was asked to give the name of the man who had actually retained him to appear for the defendants. He declined, asserting that it came within the attorney-client privilege. In rejecting this position, Justice Shientag carefully reviewed the precedents and said [150 *Misc.* 714, 270 *N. Y. S.* 367]:

"There is nothing in the books to show that the privilege was to extend to the fact of the retention of counsel. No point is made that the employment of counsel should be shrouded with secrecy. The retention of counsel was to call the privilege into operation. The privilege itself was to extend only to communications between a client and an attorney who had been retained. The name or identity of the client was not the confidence which the privilege was designed to protect.; the statements of the client for the purpose of seeking advice from his counsel were the disclosures which were to be kept secret."

██ It may perhaps be maintained that within the foregoing, the questions addressed to the defendant were properly designed to ascertain the identities of the client who retained him to appear for McLaughlin, Malone and Mello and the client who furnished the bail bond premium for Pontilli. However, since neither party has briefed or argued the matter we shall not pursue it. See *Higgins v. Krogman,* 142 *N. J. Eq.* 691, 694 (*E. & A.* 1948). The defendant answered the questions falsely, though six months later he identified his real clients as the Astores. Beyond peradventure, he was not at liberty to withhold assertion of the privilege, testify falsely, and then seek immunity from prosecution on the ground that the information was immune from disclosure.

## II.

The defendant next contends that the jury's verdict was against the weight of the evidence and that the lower court erred in declining to set it aside and enter judgment of acquittal. Reference is made to the statement in the second count that the defendant swore falsely in substance and effect, that he accepted money from Anthony Passoretti, followed by the defendant's actual testimony in which he asserted that he received the money from Pontilli's partner. The defendant urges that since he did not know Passoretti the jury was not at liberty to infer that his testimony had reference to him; we consider that this point is without substance. The defendant testified that he received the fee for the bail bond from a man whom he did not know but who was Pontilli's partner. The man known as Pontilli's partner was, in fact, Anthony Passoretti and the defendant undoubtedly intended to convey the thought that he had received the money from him. In truth, he had received it from his own client, Anthony Astore. We find no plausible basis for the defendant's attack on the verdict of the jury and the lower court's action in declining to set it aside and enter judgment of acquittal. See *State v. Goodman*, 9 *N. J.* 569, 581 (1952).

## III.

The final contention advanced by the defendant is that the lower court committed error in charging the contents of *R. S.* 2:157–5. The indictment charged the defendant with willful false swearing in violation of section 4 (*R. S.* 2:157–4—now *N. J. S.* 2A:131–4) which provided that any person "who shall willfully swear falsely in any judicial proceeding, or who shall willfully swear falsely before any person authorized by virtue of any provision of law of this state to administer an oath and acting within his authority, shall be guilty of false swearing." The case was tried entirely on the issue of whether the defendant willfully gave false testimony before the grand

jury and in its charge the trial court fairly submitted that issue to the jury. The defendant complains, however, that the trial court also referred to section 5 (*R. S.* 2:157–5— now *N. J. S.* 2*A*:131–5) which provided that "Where a person has made contrary statements on his oath or oaths administered within the provisions of this article, it shall not be necessary to allege in an indictment or allegation which statement is false but it shall be sufficient to set forth the contradictory statements and allege in the alternative that one or the other is false"; the same section provided that proof that such contradictory statements were made under oath shall be *prima facie* evidence that one or the other is false.

It is conceded that the indictment in the instant matter was not drawn under section 5; that section had nothing to do with the proceedings and should not have been mentioned. However, a reading of the charge displays that no issue under section 5 was submitted to the jury and that the only issue submitted was the proper one of whether the defendant had willfully sworn falsely in violation of section 4. The reference to section 5 was at the beginning of the charge where the trial judge stated that he "would like to read the statute in its entirety," and then proceeded to read *R. S.* 2:157–4 and *R. S.* 2:157–5 in full, along with the several ensuing sections. After completing his reading of the statute the trial judge properly instructed the jury.

In the light of the entire charge and record before us we fail to see how the defendant could have been prejudiced by the reference to section 5; it is settled that in the absence of prejudice no basis for reversal exists. *Rule* 1:2–19 (now *R. R.* 1:5–1); *State v. Larsen*, 105 *N. J. L.* 266, 270 (*Sup. Ct.* 1928). The falsity of the defendant's sworn testimony before the grand jury was admitted and the issue controverted was whether there was willful false swearing in violation of section 4. On the question of willfulness the court accurately set forth the statutory definition (*R. S.* 2:157–8— now *N. J. S.* 2*A*:131–7) and at the defendant's request charged: "The term willful involves a state of mind and in

this case the state of mind of the defendant is an important consideration. You must consider the attitude of the defendant, in respect to his duty to a client, even though a mistaken one, in judging his willfulness." It is clear that the jury properly determined the issue of willfulness against the defendant on the basis of the compelling evidence presented and was in nowise misled by the court's reading of section 5. *Cf. Middleton v. Public Service Co-Ordinated Transport,* 131 *N. J. L.* 322, 323 (*E. & A.* 1944).

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.