IN THE MATTER OF JOHN E. SELSER, CHARGED WITH CRIMINAL CONTEMPT OF COURT.

STATE OF NEW JERSEY, PETITIONER-APPELLANT, AND JOHN E. SELSER, DEFENDANT-RESPONDENT.

Argued January 11, 1954—Reargued January 25, 1954—Decided May 17, 1954.

*Mr. David H. Harris,* Special Deputy Attorney-General, argued the cause for the appellant (*Mr. Theodore D. Parsons,* Attorney-General, *Mr. Albert M. Ash,* Deputy Attorney-General, of counsel).

*Mr. Albert S. Gross* argued the cause for the respondent.

The opinion of the court was delivered by
VANDERBILT, C. J.

## I.

Since January 2, 1951 successive grand juries have been investigating widespread gambling activities in Bergen County and the corruption of public officials in the county

by racketeers. In this connection on February 24, 1953 the grand jury subpoenaed Mr. John E. Selser, a member of the Bergen County bar, to appear before it and testify. He testified that one of his clients was Guarino Moretti, also known as Willie Moore, but more commonly referred to as Willie Moretti, a notorious racketeer who was murdered on October 4, 1951 in a crime which still remains unsolved. Moretti was one of the star witnesses before the Senate Crime Committee, *Kefauver, Crime in America* (1951), *pp.* 271–275. As early as 1931 Willie Moretti had been a client of Mr. Selser, who represented him on many occasions, most notably when he was indicted on the charge of murder. Mr. Selser testified that beginning in 1931 he represented a group of racketeers:

"Q. Now, you say that you first represented these so-called racketeers back in 1931?
A. Yes, sir. I represented two of the men. Of course there were other men at that time. There was, let's see, a guy named—I remember him as Chicago Fat. I think his name was Sabio, or some such name. There was Kid Steech, S-t-e-e-c-h, as I remember the spelling of it. I can't think of his name at the moment. I think there were five of them altogether, including Willie and Solly Moretti * * * They are the clients that have been termed the racketeer element."

From 1944 to 1949 Mr. Selser was first assistant prosecutor of Bergen County. On more than one occasion he was approached by the Moretti brothers, who offered him $1,000 a month to refrain from investigating their criminal activities in the county:

"Q. Well, now, do you recall your testimony before the Grand Jury, where you were Assistant Prosecutor, or shortly after you had been appointed Prosecutor, when you were contacted with reference to a payoff?
A. I was offered money.
Q. And you were offered $1,000 a month as First Assistant Prosecutor?
A. That's absolutely so * * * That was, I think, even before I was sworn in as First Assistant Prosecutor, and I went on in my testimony and said I reported this to Walter Winne [then county prosecutor of Bergen County].

Q. Just so that the jury would have the background on this, could you tell us how that came about, that you were offered this money?

A. Well, now I am thinking about it. I think it was Solly. I think you are right. Solly was the first one to come to see me. Solly came into my office and told me—this was at 210 Main Street, my own private office—told me they wanted to congratulate me for coming into office as First Assistant Prosecutor. He said: 'Of course you know that you are entitled to some money.' I said, 'Why, Solly?' He said, 'Well, you are. I mean, there's money being made, and you are entitled to $1,000 a month.' I said, 'I don't want it. I don't want a nickel with you, Solly. Back in the time I represented you, you got 100 per cent of loyalty. I am going to represent the State now, and the State will get 100 per cent of loyalty, so you cannot pay me a nickel, Solly, not a nickel.'

Q. Were you ever approached again during the time you were Assistant Prosecutor by anyone?

A. Yes.

Q. Can you tell us who approached you the second time?

A. Willie.

Q. Willie again?

A. You were right a moment ago. It was Solly first and Willie came to me after I was sworn in. He said to me, 'Why are you so foolish? Why don't you be a good boy?' I said, 'I am being a good boy, Willie. Every gambling operation I hear anything about I report,' and he very clearly indicated to me that there was an accumulation of money if I wanted it. * * * He then asked me whether or not I would like to be United States Attorney? I said, 'Don't be foolish. You couldn't make me a United States Attorney. Let's not be funny about it, Willie.' "

The attitude of the Morettis toward the defendant, as narrated by him, is illuminating. In addition, there is no doubt that while serving as assistant prosecutor the defendant was aware that money was being paid to officials for the protection of gambling interests:

"Q. Well, Mr. Selser, you said in 1947 and 1948 you had become convinced although you might not have any definite evidence, but you were convinced that there was protection of gambling and that Orecchio was the man responsible?

A. Yes. Yes, I was satisfied money was being paid somewhere; what levels, I don't know, I couldn't prove it, and it is silly for me to make guesses where it was going or how it was going."

In 1949 Mr. Selser left the prosecutor's office and resumed the private practice of law. Whether he immediately became attorney for the Morettis is not disclosed. In any event, at 2 A. M. on October 31, 1950, after a complaint had been filed

against Joseph Doto (alias Joseph Adonis), James P. Lynch, Arthur Longano, Anthony Guarini, and Salvatore Moretti charging them with conspiracy to keep and maintain a place to which persons might resort for the purpose of gambling and a warrant had been issued against them, Mr. Selser received a telephone call from Willie Moretti retaining him as attorney in the matter. All of them except Anthony Guarini, who was at the time in prison, were produced by Selser, were arraigned, pleaded not guilty, and bail was fixed. Subsequently all five were indicted by the Bergen County Grand Jury. They entered pleas of not guilty but on May 21, 1951 they retracted these pleas and entered pleas of *non vult*, and on May 28, 1951 were sentenced to prison. Willie Moretti was not charged, arrested or indicted in Bergen County until November 7, 1952, more than two years later, when along with Harold John Adonis, Andrew Adonis and others, he was indicted for conspiracy to obstruct the due administration of the laws of the State. By that time Moretti had been dead more than a year. We refrain from comment here on the practice of indicting dead men.

Between October 31, 1950 and the date of Moretti's death less than a year later, the defendant testified he had some 200 conferences with Moretti. Although Moretti at no time was under indictment, he had been summoned to appear as a witness before the Kefauver Committee. In the course of these conversations the defendant learned of many instances in which Moretti and his associates had paid protection money to public officials and others in prominent positions at the state and county level:

"Q. Did Willie Moretti tell you that money had been paid to persons connected with Mr. Winne?
A. Yes. Yes, he told me so.
Q. Was this during a conference between yourself and your client?
A. Yes. * * *
Q. Then he did give you the names of people connected with Winne that he alleged were being paid off?
A. He? You mean Willie?
Q. Willie, yes.
A. Yes, Willie gave me certain names."

Moretti also divulged to him the names of persons who had received political contributions from the "racketeer elements." He likewise discussed with the defendant a visit which he had paid, also at 2 A. M., to the home of Mr. John J. Dickerson, then chairman of the Republican State Committee and a member of the Board of Chosen Freeholders of Bergen County, 13 days after he had retained the defendant to represent him and his associates. Concerning this visit Mr. Dickerson testified before the grand jury:

"Well, Moretti said he couldn't understand why his people were being pushed around so, almost to use his language. I guess he was referring particularly to the proposed trials of the people that were tried, whereas he had always been very cooperative with the State administration. I asked him specifically what he meant by that and he told me that he had been paying for State protection; he had paid Harold Adonis $12,000 a month for State protection. * * * He evidently was trying, as I say, to put the heat on me to have me intercede to have the Grand Jury go easy on him in light of the fact that he had been contributing this money. He didn't understand. He evidently felt he had paid for State protection and was at a loss to understand why we should go ahead and do this."

Again the attitude of Moretti is significant.

At the grand jury proceedings on February 24, 1953, many questions were propounded to the defendant. Four of them he refused to answer on the ground that they involved privileged communications between attorney and client, and therefore he was under a duty to his client, the late Willie Moretti, to decline to answer them:

"Q. Well, just so we can clarify the record, I do want to ask you specifically if you will give us those names which were disclosed to you by your clients, as to who was paid protection money, and ask you to answer that specific question.

Q. Now, I would like to ask you a specific question for the record. Can you give us the names of the persons receiving political contributions on the State and County level as given to you by your so-called racketeer clients?

Q. Well, did he (Willie Moretti) tell you that he (Willie Moretti) had been to Mr. Dickerson's home?

Q. Did he (Willie Moretti) tell you also with reference to the fact that a conversation occurred between him (Willie Moretti) and Dickerson?

On being directed by the foreman of the grand jury to answer each question Mr. Selser again refused.

Thereupon the Attorney-General filed a petition in the Superior Court and obtained an order to show cause why the defendant should not be directed to answer these questions. Affidavits were filed by both parties, and on the return day the defendant testified that the information given to him was divulged in the course of his representation of Willie Moretti, who at the time was under investigation by the Kefauver Committee. The State on the other hand contended that these communications were made in contemplation of crime and were made as a part of a continuing conspiracy to corrupt public officials, although it is not claimed that the defendant knew that this was his client's purpose. After argument the trial court discharged the order to show cause on the ground that the communications were privileged. On appeal the Appellate Division of the Superior Court affirmed the decision of the trial court and by reason of the dissent in the Appellate Division the State brings this appeal as of right.

The substantive issue is whether the revelations by Willie Moretti to his attorney concerning his continuing activities in bribing public officials are privileged or whether the details of the crimes that are made known to the attorney must be divulged by him. Closely related to the substantive issue is the question of the degree of proof of the client's corrupt purpose required of the State to destroy the privilege.

In considering the issues before us we take judicial notice from the cases heretofore heard by us and from the reported New Jersey decisions in other courts of the State that we are not dealing with an isolated case or even with a single community that has by reason of some peculiar misfortune become the victim of official corruption through racketeering influences. Rather we are faced with a situation, unfortunately not uncommon in this country (see the reports of the Kefauver and O'Conor Committees, *Sen. Rep. No. 307, 82nd Cong. 1st Sess.* (1951), *pp.* 1–7, 181–186, and *Sen. Rep. No. 725, 82nd Cong., 1st Sess.* (1951), *pp.* 2–5, 37–38), where organized crime has been able to flourish in a wide area be-

cause of its ability to bribe local officials. The willingness, in fact the eagerness, of some local enforcement officers to accept bribes is graphically described by an expert in this field, Willie Moretti himself, in a statement to his attorney, which is part of the record in this case:

"Clear your mind about us trying to corrupt public officials. We are fighting them off all the time to prevent them asking for more."

The State does not contend nor do we find that there was any conspiracy to obstruct justice between Willie Moretti and the defendant.

## II.

■■ The rules of law controlling both issues in the instant case have never been better summarized than by Mr. Justice Cardozo, speaking with his customary felicity of phrase for a unanimous court in *Clark v. United States*, 289 *U. S.* 1, 15, 53 *S. Ct.* 465, 469, 77 *L. Ed.* 993, 1000 (1933) as follows:

"* * * There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told. There are early cases apparently to the effect that a mere charge of illegality, not supported by any evidence, will set the confidences free. See, *e. g.*, *Reynell v. Sprye*, 10 *Beav.* 51, 54 [50 *Eng. Reprint*, 501], 11 *Beav.* 618 [50 *Eng. Reprint*, 955]; *Re Postlewaite*, 35 *Ch. D.* 722, 724; *cf. Regina v. Bollivant* (1900) 2 *Q. B. D.* 163, (1901) *A. C.* 196 [*C. A.*]. But this conception of the privilege is without support in later rulings. 'It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud.' *O'Rourke v. Darbishire* (1920) *A. C.* 581, 604. To drive the privilege away, there must be 'something to give colour to the charge'; there must be '*prima facie* evidence that it has some foundation in fact.' *O'Rourke v. Darbishire, loc. cit., supra;* also *pp.* 614, 622, 631, 633. When that evidence is supplied, the seal of secrecy is broken. See, also, *Regina v. Cox* (1884), 14 *Q. B. D.* 153, 157, 161, 175; *cf. Bujac v. Wilson*, 27 *N. M.* 112, 196 *P. Rep.* 513; *Re Niday*, 15 *Idaho*, 559, 98 *P.* 845. The judgment of the House of Lords in *O'Rourke v. Darbishire* has given the whole subject a definite exposition. Nor does the loss of the privilege depend upon the showing of a conspiracy, upon proof that client and attorney are involved in

equal guilt. The attorney may be innocent, and still the guilty client must let the truth come out. *Regina v. Cox* [(1884) *L. R. 14 Q. B. Div.* 153], *supra; Matthews v. Hoagland*, 48 *N. J. Eq.* 455, 469, 21 *A.* 1054; *State v. Faulkner*, 175 *Mo.* 546, 593, 75 *S. W.* 116; *Standard Fire Ins. Co. v. Smithhart*, 183 *Ky.* 679, 684, 211 *S. W.* 441, 5 *A. L. R.* 972; *State v. Kidd*, 89 *Iowa* 54, 56 *N. W.* 263; *cf. Bank of Utica v. Mersereau*, 3 *Barb. Ch., N. Y.*, 528, 598, 49 *Am. Dec.* 189; *Coveney v. Tannahill*, 1 *Hill, N. Y.*, 33, 41, 37 *Am. Dec.* 287."

The application of these rules of law to the facts of the instant case is dispositive of the matter, but the questions raised are of such far-reaching significance in the administration of criminal justice today that it is important to demonstrate that the rules enumerated in the *Clark* case involve no element of novelty but rather reflect the uniform current of legal opinion, here and elsewhere, and are based on sound considerations of public policy that are more vital today than ever before in view of the inroads of organized crime on the orderly processes of government. In fact, to our knowledge no other standards are in force elsewhere.

▮ In this State there is no statutory authority for a privileged communication between attorney and client, but that privilege has long been recognized here as a part of our common law. "The attorney-client privilege is likewise firmly embedded in our common law, although not embodied in either constitutional or statutory provision," *State v. Toscano*, 13 *N. J.* 418, at 424 (1953). The privilege is an ancient one long recognized in the codes of the continental countries, *Radin, The Privilege of Confidential Communication Between Lawyer and Client,* 16 *Calif. L. Rev.* 487 (1928). According to 8 *Wigmore, Evidence* (3rd ed. 1940), 547, and 1 *Thornton, Attorneys at Law* (1914), 159, the privilege was first recognized in England in 1577 in *Berd v. Lovelace, Cary* 62, where a solicitor was held to be exempt from an examination concerning matters involved in the litigation. Drinker has more recently pointed out that the privilege was recognized in England as early as 1280 in an ordinance of the City of London, *Drinker, Legal Ethics* (1953), 15, 132. See 6 *Holdsworth, History of English Law* (1924), 433.

██ Originally the privilege was based upon a concern for "the oath and the honor of the attorney" rather than regard for the protection of the client and the furtherance of justice, 8 *Wigmore*, 547. By the 19th Century, however, the courts based the privilege on the need for consultation between attorney and client without fear of public disclosure. Thus in 1833 in *Greenough v. Gaskell*, 1 *Myl. & K.* 98, 103, we find Lord Chancellor Brougham saying:

> "The foundation of this rule is not difficult to discover. It is not (as has sometimes been said) on account of any particular importance which the law attributes to the business of legal professors, or any particular disposition to afford them protection (though certainly it may not be very easy to discover why a like privilege has been refused to others, and especially to medical advisers). But it is out of regard to the interests of justice, which cannot be upholden, and to the administration of justice, which cannot go on without the aid of men skilled in jurisprudence, in the practice of the courts, and in those matters affecting rights and obligations which form the subject of all judicial proceedings. If the privilege did not exist at all, everyone would be thrown upon his own legal resources. Deprived of all professional assistance, a man would not venture to consult any skillful person, or would only dare to tell his counsellor half his case."

Dean Wigmore has epitomized the underlying reasons for the rule:

> "The policy of the privilege has been plainly grounded, since the latter part of the 1700's, on subjective considerations. In order to promote freedom of consultation of legal advisers by clients, the apprehension of compelled disclosure by the legal advisers must be removed; and hence the law must prohibit such disclosure except on the client's consent." 8 *Evidence*, 550.

Since the protection of the privileged communication is not for the attorney but rather for the client, not only may the client alone waive the privilege, *State v. Loponio*, 85 *N. J. L.* 357, 360 (*E. & A.* 1913); *Russell v. Second National Bank of Paterson*, 136 *N. J. L.* 270, 278 (*E. & A.* 1947), but the attorney if called as a witness must assert the privilege where applicable, unless it has been waived by the client, *Canons of Professional Ethics*, 37; 58 *Am. Jur.* 259. The final determination of the existence of the privilege, however, rests with

the court, and if it determines that the privilege does not exist then the attorney must testify as to the matters contained in the communication, *Slate v. Toscano, supra*, 13 *N. J.* 418, 424.

Since it results in the exclusion of evidence, the doctrine of privileged communication runs counter to the fundamental theory of our judicial system that the fullest disclosure of the facts will best lead to the truth and ultimately to the triumph of justice. Thus we are faced with two competing policies of the law—the one calling for the full disclosure of all the facts in order that justice may prevail, the other demanding secrecy as to facts divulged by the client to his attorney in order that the client will not hesitate to make full disclosure to the attorney, who in turn can then best advise him. The conflict between these two policies was recognized in one of the early works in this field:

"The expediency of this rule must depend not on the impropriety of violating the confidence reposed, but on a consideration that the collateral inconvenience which would ensue if no such confidence were reposed would preponderate over the direct mischief produced by a chance of the failure of justice resulting from the exclusion of the evidence." *Phillips, Evidence*, 134.

It was this conflict of underlying theories that led Mr. Justice Cardozo to say in *Clark v. United States, supra*, 289 *U. S.* 1, 13, 53 *S. Ct.* 465, 469, 77 *L. Ed.* 993, 999 (1933):

"But the recognition of a privilege does not mean that it is without conditions or exceptions. The social policy that will prevail in many situations may run foul in others of a different social policy, competing for supremacy. It is then the function of a court to mediate between them, assigning, so far as possible, a proper value to each."

In adjusting this conflict in policy our courts have uniformly recognized that the privilege is not absolute, but rather an exception to a more fundamental policy. It is therefore to be strictly limited to the purposes for which it exists. Since the recognition of the privileged communication between attorney and client rests in the suppression of the truth "the privilege should be strictly construed in accord-

ance with its object." *United States v. United Shoe Machinery Corp.*, 89 *F. Supp.* 357, 358 (*D. C. Mass.* 1950). "The privilege is an anomaly and ought not to be extended." *Broad v. Pitr*, 1 *M. & M.* 233, 3 *C. & P.* 518 (1828). "The rule of privilege, having a tendency to prevent the full disclosure of the truth, ought to be construed strictly." *Foster v. Hall*, 12 *Pick.* 89, 97 (*Mass.* 1831). Summarizing the doctrine, Dean Wigmore states:

"Nevertheless, the privilege remains an exception to the general duty to disclose. Its benefits are all indirect and speculative; its obstruction is plain and concrete. Even the answers to Bentham's argument concede that it is accurate and well-founded in its application to a certain proportion of cases. *It is worth preserving for the sake of a general policy; but it is nonetheless an obstacle to the investigation of the truth. It ought to be stictly confined within the narrowest possible limits consistent with the logic of its principle."* (8 *Evidence*, 557)

See *Prichard v. United States*, 181 *F. 2d* 326, 328 (*C. A.* 6, 1950), affirmed 339 *U. S.* 974, 70 *S. Ct.* 1029, 94 *L. Ed.* 1380 (1950); *People ex rel. Mooney v. Sheriff*, 269 *N. Y.* 291, 295, 199 *N. E.* 415, 416, 102 *A. L. R.* 769 (*Ct. App.* 1936); *People ex rel. Vogelstein v. Warden of County Jail*, 150 *Misc.* 714, 270 *N. Y. S.* 362, 370 (*Sup. Ct.* 1934), affirmed 242 *App. Div.* 611, 271 *N. Y. S.* 1059 (*App. Div.* 1934), 5 *Vanderbilt L. Rev.* 589, 593 (1952), *Morgan, Suggested Remedy for Obstructions to Expert Testimony by Rules of Evidence*, 10 *U. of Chicago L. Rev.* 285, 289 (1942), *Radin, supra*, 16 *Calif. L. Rev.* 487.

█ In limiting the instances where the privilege applies the courts have clearly established the rule that where the client consults the attorney in reference to a future criminal or fraudulent transaction the privilege does not exist whether or not the attorney is aware of his client's purpose. This was recognized by Vice-Chancellor Green in *Matthews v. Hoagland*, 48 *N. J. Eq.* 455, at 469 (*Ch.* 1891):

" 'In order that the rule may apply, there must be both professional confidence and professional employment; but, if the client has a criminal object in view in his communications with his solicitor, one of these elements must necessarily be absent. The client must either

conspire with his solicitor or deceive him. If his criminal object is avowed, the client does not consult his adviser professionally, because it cannot be the solicitor's business to further any criminal object. If the client does not avow his object, he reposes no confidence, for the state of facts which is the foundation of the supposed confidence does not exist. The solicitor's advice is obtained by a fraud.'

As I understand the case, the rule in its different phases and the reasons may be thus stated: If the client consults the lawyer with reference to the perpetration of a crime, and they cooperate in effecting it, there is no privilege; for it is no part of an attorney's duty to assist in crime,—he ceases to be counsel and becomes a criminal. If he refuses to be a party to the act, still there is no privilege, because he cannot properly be consulted professionally for advice to aid in the perpetration of a crime. In the case of a fraud, if it is effected by the cooperation of the attorney, it falls within the rule as to crime, for their consultation to carry it out is a conspiracy, which on its accomplishment, by the commission of the overt act, becomes criminal, and an indictable offense.

If the client discloses his fraudulent purpose, and the attorney does not join in the scheme, but repudiates all connection with it, there cannot be, properly speaking, professional employment to effect such purpose, and consequently there is no privilege. If the client does not frankly and freely disclose his object and intention as well as facts, there is no professional confidence, and consequently no privilege. [The application of the rule] proceeds on the ground that the privilege is that of the client, and bases his right to claim it, or liability to lose it, on his own conduct. If it has been such that its criminal and fraudulent object and purpose puts him beyond the pale of the law's protection, or if to conceal [his purpose] he has not reposed full confidence in his counsel, he cannot invoke a rule which the law has created, as Lord Brougham said, in *Greenough v. Gaskell*, 1 *Mylne & K.* 98 'out of regard to the interests and the administration of justice.' "

Similarly in *In re Stein*, 1 *N. J.* 228, 236 (1949), it is stated:

"To bring a matter within the rule of 'privilege' there must be both professional employment and professional confidence. A lawyer cannot be properly consulted professionally for advice to aid in the perpetration of a fraud on a court. The claim of 'privilege' is that of the client and a fraudulent object or purpose puts him beyond the pale of the Law's protection. *Matthews v. Hoagland*, 48 *N. J. Eq.* 455 (*Ch.* 1891)."

The New Jersey decisions are supported by the authorities elsewhere, 8 *Wigmore, Evidence*, 573.

In spite of the overwhelming weight of authority sustaining the views herein set forth, the defendant argues that

to force an attorney to testify concerning any statement to him by his client, even if it related to a continuing crime, is a violation of a constitutional right. There is, however, no basis whatever for this notion, for the privilege as we have seen originated in judicial decisions without any support either in any statute or in the Constitution, *State v. Toscano, supra*, 13 *N. J.* 418, at 424 (1953). The defendant here is confusing the constitutional right of an accused to counsel at his trial, *New Jersey Constitution, Article* I, *paragraph* 10, with the limited common-law privilege where a client is seeking professional advice from his attorney solely in preparation for defending himself against a criminal charge. The beneficent purpose of the privilege in such instances in maintaining evenly the scales of justice between the State and a defendant accused of crime is generally conceded.

But the defendant goes beyond asserting an absolute privilege as a constitutional right. He in effect maintains that the attorney is the sole judge of what communications of his client he shall divulge, of what questions he will answer. Thus in the present case, it will be recalled, he testified that Moretti told him money had been paid by Moretti to persons connected with the county prosecutor and that Moretti gave the defendant certain names in connection therewith, but he declined to give the names to the grand jury.

This contention of the defendant brings us squarely to the second question in this appeal, of whether it is to be the attorney or the trial judge who is to determine whether the seal of the privilege has been broken and on what proof. It would be a sorry day for the public if the privilege were to be extended from its legitimate purpose in aiding an accused in preparing his defense against an existing accusation to cases of continuing crime or conspiracies against society, and if to an accused's constitutional right to refuse to testify on the ground that it would incriminate him were to be added a right in his attorney or himself to decide what questions the attorney would answer. Fortunately for the public weal, the question has been decided otherwise.

 Mr. Justice Cardozo has stated the law on this point succinctly in *Clark v. United States, supra*, 289 *U. S.* 1, 15, 53 *S. Ct.* 465, 469, 77 *L. Ed.* 993, 1000: "To drive the privilege away, there must be '*something* to give *colour* to the charge'; there must be '*prima facie* evidence that it has *some* foundation in fact'" (italics supplied). This test is followed in the American Law Institute's *Model Code of Evidence, Rule* 212:

"Lawyer-Client Privilege; Communication in Aid of Crime or Tort.

No person has any privilege * * * if the judge finds the sufficient evidence, aside from the communication, has been introduced to warrant a finding that the legal service was sought or obtained in order to enable or aid the client to commit or to plan to commit a crime or a tort."

The reasons for the rule are elaborated in the *Comment* to *Rule* 212:

"It is now agreed that a confidential communication between lawyer and client to secure legal advice to enable the client to commit a crime or a tort, or to assist him in so doing, is not privileged. Certainly no social policy can be said to justify a privilege in such a situation. Only a few cases discuss the showing which must be made as a preliminary to compelling the disclosure. The Rule is in accord with the statement of Mr. Justice Cardozo in *Clark v. United States*, 289 *U. S.* 1, 15, 53 *S. Ct.* 465, 77 *L. Ed.* 993 (1933). It does not require a finding by the judge that the communication was for the forbidden purpose, but merely that there is sufficient evidence to sustain such a finding. When once that *quantum* of evidence has been introduced, then evidence of the communication, if otherwise admissible, is receivable. That evidence may, of itself, strongly tend to show that the advice was being sought to enable the client to commit a wrong. To require a finding of the forbidden purpose by the judge on evidence exclusive of the content of the communication would make the Rule impracticable in application. When the evidence is received, it is to be used by the trier of fact for what it is worth. Such use is not to be conditioned upon any finding by the jury as to the purpose for which the advice was sought or secured."

For cases applying this test see *United States v. Bob*, 106 *F. 2d* 37, 40, 125 *A. L. R.* 502 (*C. C. A.* 2, 1939), *certiorari* denied 308 *U. S.* 589, 60 *S. Ct.* 115, 84 *L. Ed.* 493 (1939); *S. E. C. v. Harrison*, 80 *F. Supp.* 226, 231, 232 (*D. D. C.*

1948), rehearing denied 87 *U. S. App. D. C.* 232, 184 *F. 2d* 691, *certiorari* granted and proceedings dismissed 340 *U. S.* 908, 71 *S. Ct.* 290, 95 *L. Ed.* 656 (1951); *Atlantic Coca-Cola Bottling Company v. Goss,* 50 *Ga. App.* 637, 179 *S. E.* 420 (*Ct. App.* 1935); *Higbee v. Dresser,* 103 *Mass.* 523 (*Sup. Jud. Ct.* 1870); *Carney v. United R. Co.,* 205 *Mo. App.* 495, 226 *S. W.* 308 (*Ct. App.* 1920); *People ex rel. Vogelstein v. Warden of County Jail, supra,* 270 *N. Y. S.* 362, 371; *Nadler v. Warner Co.,* 321 *Pa.* 139, 184 *A.* 3 (*Sup. Ct.* 1936); *Williams v. Williams,* 108 *S. W. 2d* 297 (*Tex. Civ. App.* 1937). See *Privilege-Attorney and Client,* 125 *A. L. R.* 508.

 Has the State produced sufficient evidence from which the court could find the existence of "something to give colour to the charge" of continuing misconduct, something that constitutes *"prima facie* evidence that it has some foundation in fact" within the language of the *Clark* case?

In the light of the facts before us the question must be answered emphatically in the affirmative. There is no doubt that Moretti was engaged in illegal practices—his business was crime—and that he was attempting to undermine the proper administration of justice in Bergen County, a crime for which he was later indicted. It is likewise undisputed that as far back as 1931 the defendant was the attorney for Willie Moretti. While assistant prosecutor the defendant was convinced that money was being paid to officials for the protection of gambling interests. In fact, the defendant testified before the grand jury that his former client had offered him as first assistant prosecutor a bribe of $1,000 a month to "lay off" the gambling interests in Bergen County at the time. After leaving the prosecutor's office in 1949 the defendant again became attorney for Willie Moretti and other racketeers, and at 2 a. m. on October 31, 1950 Moretti retained him to represent five associates who had been arrested and charged with conspiracy to keep and maintain a gambling place. It is significant that the defendant had over 200 meetings with his client between October 31, 1950 and Moretti's death on October 4, 1951. During this period of nearly a year Moretti was not under indictment, although

he was still carrying on his nefarious trade of corrupting public officials.

Coming to specific incidents, startling proof of Moretti's continued flaunting of the law is to be found in the fact that within two weeks after the defendant was called in by Moretti to represent the five who had been arrested, Moretti paid his famous visit on November 12, 1950 to the home of John J. Dickerson, Bergen County Freeholder and Republican State Chairman. Mr. Dickerson's own testimony before the grand jury was in substance that Moretti complained to him that he had been paying Harold John Adonis $12,000 a month for state protection, but that instead the State continued to close up gambling places and to prosecute his associates. The only inference to be drawn from this testimony is that Moretti got in touch with Mr. Dickerson as a party leader to get him to take steps to see that the law enforcement officers "laid off" the gambling activities of Moretti and his friends in Bergen County and, to quote Mr. Dickerson, "to put the heat on" and "to intercede" for him with the grand jury in view of his payments of $12,000 a month for protection.

Of a piece with the Dickerson testimony is Moretti's own lament, quoted by the defendant, that public officials were constantly demanding more money for violating their official duty.

Finally, there are the more than 200 conferences Willie Moretti had with the defendant in the period of less than a year from October 31, 1950, when he retained the defendant, until his death on October 4, 1951. During this period Moretti was neither under arrest nor indictment. Instead he was, as we have seen, pursuing his life of crime, brazenly corrupting public officials. We cannot be so naive as to suppose that Moretti had these 200 and more conferences—averaging over four a week—solely to prepare for the pleading *non vult* of his associates or for the defense of his own prospective post-mortem indictment or for his appearance before the Kefauver Committee, where all he was required to do was to tell the truth.

Any one of these three items of proof would suffice to "give colour" to the State's charge of fraud and to provide *"prima facie* evidence that it had some foundation in fact." Collectively they can leave no doubt to any mind that is reasonably alert to the realities that Willie Moretti's conduct had been such that to permit him to avail himself of the privilege, had he been alive, would be to violate the well-settled principles of law herein set forth, to the obvious detriment of the public welfare. In these circumstances the privilege does not exist.

The State does not contend and, as we have said before, we do not find that the defendant knew of his client's corrupt purpose or that there was any conspiracy to obstruct justice between Willie Moretti and the defendant. Such a finding is not necessary to the application of the rules of law herein set forth; "The attorney may be innocent and still the guilty client must let the truth come out," *Clark v. United States, supra,* 289 *U. S.* 1, 15, 53 *S. Ct.* 465, 469, 77 *L. Ed.* 993, 1000 (1933). See also *Matthews v. Hoagland, supra,* 48 *N. J. Eq.* 455, 469 (*Ch.* 1891).

The judgment below is reversed, and the case is remanded to the trial court with instructions to enter an order directing the defendant to answer the four questions propounded to him by the grand jury.

HEHER, J. (dissenting). The accommodation of competing public interests is an historic function and responsibility of the judiciary. For more than three centuries it has been deemed a fundamental maxim that "the public has a right of every man's evidence"; the public "has a right to all the assistance of every individual," to use the words of Lord Hardwicke in the debate in 1742 on a bill to pardon in advance such witnesses as should criminate themselves in testifying to the frauds of Sir Robert Walpole, Earl of Oxford. *Wigmore on Evidence* (3d ed.), *section* 2192. Said Tilghman, C. J., in *Baird v. Cochran,* 4 *Serg. & R., Pa.,* 397, 400 (1818):

"From the nature of society, it would seem that every man is bound to declare the truth when called upon in a court of justice. * * * The general welfare will be best promoted by considering the disclosure of truth as a debt which every man owes his neighbor, which he is bound to pay when called on, and which in his turn he is entitled to receive."

It is "as much the duty and interest of every citizen to aid in prosecuting crime as it is to aid in subduing any domestic or foreign enemy; and it is equally the interest and duty of every citizen to aid in furnishing to all, high and low, rich and poor, every facility for a fair and impartial trial when accused; for none is exempt from liability to accusation and trial." *Israel v. State*, 8 *Ind.* 467 (*Sup. Ct.* 1856).

Yet this rule has its exceptions, grounded in overriding considerations of public policy. Against testimonial duty and compulsion, for a full disclosure in the interest of truth and essential justice, is the privilege accorded communications between attorney and client. This privilege is of the very essence of a relation of trust and confidence that, while not made the subject of express constitutional protection, is yet interrelated with the specific constitutional guaranties of the individual's right of counsel and security against self-crimination.

This is the oldest of the privileges for confidential communications, going back to the reign of Elizabeth, where it stood unquestioned; and, since the testimony of witnesses (as we know it) did not become a common source of proof in jury trials till the early 1500's, and testimonial compulsion did not materialize until the early part of Elizabeth's reign, the privilege came into being, said Dean Wigmore, "as a natural exception to the then novel right of testimonial compulsion." *Wigmore, section* 2290. While the ground of exclusion in those early days was consideration for "the oath and the honor" of the attorney, rather than for the apprehensions of his client, and the privilege does not now have express constitutional sanction, the attorney is by common consent, for the protection of his client, "under a solemn pledge of secrecy, not less binding because it is implied and

seldom expressed." *Wigmore, sections* 2286, 2290. "The first duty of an attorney is to keep the secrets of his clients." *Taylor v. Blacklow,* 3 *Bing. N. C.* 249 (1836). In the late 1700's the "point of honor" doctrine was repudiated as not a just ground for interference with the judicial search for truth, and the attorney's exemption from testimonial disclosure was justified and enlarged out of a sense of necessity to provide subjectively for the client's freedom of apprehension in consulting his legal advisor, assured by removing the risk of disclosure by the attorney even at the hands of the law. And so, said Lord Eldon, what at the outset was regarded as the attorney's privilege came to be "the privilege of the client and the public." *Wright v. Mayer,* 6 *Ves. Jr.* 281 (1801). The exemption is grounded in a "substantial individual interest" which outweighs the "public interest in the search for truth." Compare *United States v. Bryan,* 339 *U. S.* 323, 70 *S. Ct.* 724, 94 *L. Ed.* 884 (1950). There are differences between the old theory and the new which are not pertinent to this inquiry. *Vide Wigmore on Evidence* (*3d ed.*), *section* 2290.

Thus, the policy of the privilege is to promote freedom of consultation of legal advisors by clients by removing the apprehension of compulsory disclosure by the legal advisors; and hence the law prohibits such disclosure save on the client's consent. *Wigmore, section* 2291. The foundation of the rule "is out of regard to the interests of justice, which cannot be upholden, and to the administration of justice, which cannot go on without the aid of men skilled in jurisprudence, in the practice of the courts, and in those matters affecting rights and obligations which form the subject of all judicial proceedings." *Greenough v. Gaskell,* 1 *Myl. & K.* 98, 103 (1833). Without secrecy of communication there cannot be the "unrestricted and unbounded confidence in the professional agent" which is indispensible to the administration of justice. *Anderson v. Bank, L. R.* 2 *Ch. D.* 644, 649 (Jessel, M. R., 1876). The privilege is vain if it does not secure freedom of professional consultation. Unless the confidence be inviolable, there will of necessity be restraints

upon communication working grievous injury and injustice. There is no greater trust than counseling the uninformed in the law. And the privilege is not confined to communications in aid of litigation begun or contemplated. *Wigmore, section 2294.* Such is the nature of this privilege against testimonial disclosure.

But it goes without saying that there is no privilege covering an abuse of the relation. *In re Stein,* 1 *N. J.* 228 (1949). The privilege against testimonial compulsion is *ex necessitate* contained by the essential reason and spirit of the policy, and is proof against perversion to an unlawful use. It does not avail to protect the client "in concerting with the attorney a *crime* or other evil enterprise"; this for the "logically sufficient reason that no such enterprise falls within the just scope of the relation between legal adviser and client"; delineating the boundaries of the limitation is not without difficulty, but the reasons of policy which underlie the privilege "all cease to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing,* but to *future wrongdoing.* From that point onwards, no protection is called for by any of these considerations." *Wigmore, section 2298.* The inquiry is whether there was advice as to future wrongdoing as contrasted with past acts.

Such is the essence of the holding of Cardozo, J. in *Clark v. United States,* 289 *U. S.* 1, 53 *S. Ct.* 465, 77 *L. Ed.* 993 (1933), that a client "who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law," and a "mere charge of illegality, not supported by any evidence," is not enough, but to "drive the privilege away, there must be 'something to give colour to the charge;' there must be '*prima facie* evidence that it has some foundation in fact,'" and the "seal of secrecy is broken" only when "that evidence is supplied."

This is the rationale of the rule approved by the American Law Institute in its *Model Code of Evidence.* There can be no privilege against disclosure if there is sufficient evidence, apart from the communication, to warrant a finding that the legal service was "sought or obtained in order to enable

or aid the client to commit or to plan to commit a crime or a tort." *Rule* 212. It is shown by the comment to the rule that the intention was to adopt the philosophy expounded by Justice Cardozo in the cited case of *Clark v.. United States,* that no social policy can be said to justify a privilege against disclosure of a "confidential communication" between lawyer and client "to secure legal advice to enable the client to commit a crime or a tort, or to assist him in so doing."

But I submit there is no ground here for breaking the immemorial seal of secrecy. The requisite *quantum* of proof was, not adduced. There is no evidence whatever that advice in aid of future wrongdoing was either sought or given. There is no suggestion of a criminal act or purpose under the cloak of the professional relationship—nothing to indicate the legal service was sought or obtained to aid the client in the planning or perpetration of a crime or a tort. Indeed, the majority exonerates the respondent attorney of conspiratorial complicity—of "any conspiracy" with his client "to obstruct justice." The questions put all related to past acts and events. The client, Moretti, was then under inquiry by the Senate Crime Committee headed by Senator Kefauver and the Bergen County Grand Jury in relation to gaming and alleged official corruption. There is no doubt of the existence of the relation of attorney and client; there is no contention *contra.* The questions all related to the identity of past recipients of "protection money" and "political contributions on the State and County level," as revealed by the respondent attorney's "so-called racketeer clients," and whether his client, Moretti, "had told him that he had been to Mr. Dickerson's home" and "a conversation had occurred between him (Moretti) and Dickerson."

Obviously, these questions were not directed to the seeking or receiving of advice to promote future wrongdoing, beyond the lawful scope of the relation of attorney and client; indeed, the contention of the Deputy Attorney-General on the oral argument was that Moretti's visit to Mr. Dickerson evinced a continuing purpose to obstruct justice which, in itself, deprived him of the privilege and would subject the

attorney to call as a witness against him, freed of the duty of secrecy, on the trial of the later indictment had Moretti lived to respond to the charge. Certainly, the subsequent behavior of the client cannot alter the essential nature of the confidences legitimately reposed in the attorney where advice or aid for the commission of a crime or a tort was neither sought nor given.

If the rule be as the State conceives it, then the constitutional protection against self-crimination has little meaning: for the evidence which could not be had from the defendant himself would be adducible from his attorney, by an invasion of the confidence that induced the disclosures by the client to his attorney. Either that or the constitutional right to counsel would be subverted. The solemn obligation of secrecy inherent in this basic right to counsel is for the transgressor as well as the clean of heart, so long as the privilege is not turned to an unlawful end; and of such misuse there must be *prima facie* evidence, not mere conjecture or surmise.

The acceptance of the thesis here tendered will work a radical impairment of a great principle of civil liberty that has stood the test of centuries as founded in natural justice.

I would affirm the judgment.

OLIPHANT and WACHENFELD, JJ., join in this dissent.

*For reversal*—Chief Justice VANDERBILT, and Justices BURLING, JACOBS and BRENNAN—4.

*For affirmance*—Justices HEHER, OLIPHANT and WACHENFELD—3.